KDE/AS
F. #2015R01691

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                          Docket No. 18-CR-123 (S-1) (CBA)

JOHN SCARPA JR., et al.,

          Defendants.

– – – – – – – – – – – – – – – – –X

THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
OR NEW TRIAL

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Keith D. Edelman
Andrey Spektor
Assistant U.S. Attorneys
    (Of Counsel)

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .......................................................................................2

ARGUMENT ........................................................................................................9

I.    Applicable Law ............................................................................................9

      A.  Rule 29 .................................................................................................9

      B.  Rule 33 ...............................................................................................10

II.   Analysis......................................................................................................11

      A.   The Jury Was Not Irrational in Convicting Scarpa of Count Four (Subsantive
           Travel Act Violation ........................................................................11

           1.  Scarpa Wanted Cherry's False Testimony ..............................11

           2.  Scarpa Knew What Cherry Wanted for His False Testimony ...............13

           3.  Scarpa Is "Okay" Because Cherry Will Play it How He Wanted ...........14

           4.  Benefits Conveyed .................................................................19

           5.  Cherry Provided Helpful, Perjurious Testimony for Scarpa..................23

           6.  More Circumstantial Proof: Consciousness of Guilt ...............25

      B.   The Jury Was Not Irrational in Convicting Scarpa of Count Three
           (Conspiring to Commit Travel Act Violation)........................................29

      C.   The Court Should Not Grant a New Trial ..............................................30

CONCLUSION..................................................................................................34

PRELIMINARY STATEMENT

The defendant John Scarpa, Jr. was convicted of substantive and conspiratorial violations of the Travel Act for bribing a witness.   He moves to vacate both convictions because, he claims, there was insufficient evidence to support the verdict, and the verdict was against the weight of the evidence.

Both arguments fail.  Scarpa was intercepted agreeing with a co-conspirator, Charles "TA" Gallman, to bribe Luis Cherry to testify.  Gallman told Scarpa that Cherry was willing to "play it" however Scarpa wanted, and that Cherry wanted a "bunch of stuff" in return. Gallman added, on a call with another person, that Cherry was willing to testify but only if he received help with his appeal, which Gallman had agreed to provide.  Cherry then testified, perjuring himself in a way that helped Scarpa (and his client, Reginald Ross), while accounting for proof that Scarpa knew would be problematic if Cherry simply repeated his prior lies.  When Scarpa's bribery scheme was exposed, he reacted just as a guilty person would: demanding to know from Gallman if his meeting with Cherry was recorded, and changing his trial strategy to suggest that he knew Cherry was a liar all along.

Scarpa asks the Court to ignore uncontroverted evidence and deny the jury the opportunity to draw reasonable, logical inferences.  The Court cannot do that in deciding his Rule 29 motion, and should not do it under Rule 33, because Scarpa has offered no reason to believe that an "innocent person" has been convicted.  Accordingly, the motions should be denied.

<u>STATEMENT OF FACTS</u>

Scarpa's charges stemmed from his participation in a scheme to bribe Cherry in the 2014-15 bench trial of <u>People v. Reginald Ross</u> in front of Suffolk County Supreme Court Justice William Condon.  Ross was charged (and ultimately convicted) of the separate, unrelated murders of Raymond Hirt and John Williams.  He retained Scarpa to represent him.

Former Assistant District Attorney Robert Biancavilla testified about the <u>Ross</u> trial.  He described the different accounts that Cherry had given after confessing and pleading guilty to killing Williams with Ross.  Trial Transcript ("Tr.") 45:1-46:1; Government Exhibit ("GX") 209 (minutes from Cherry's plea, during which Cherry allocuted to Ross's role in the murder); GX 200 (Cherry's post-arrest statement).  In his initial sworn statement, Cherry detailed the Williams murder and Ross's motive for killing him—a drug debt.  Tr. 72:6-12.  The debtor was dating Allison Luberda, who testified at the <u>Ross</u> trial that Ross had confessed to her about killing Williams and Hirt.  Tr. 73:11-14, 74:1-25.  It was Luberda's friend, Kyle Greening, who owed Ross money, and so Ross wanted to kill Greening's best friend, Scott Williams, to send Greening a message.  Tr. 74:22-75:12.  Ross and Cherry ultimately killed the wrong Williams, shooting Scott's brother, John.  Cherry detailed exactly how he and Ross carried out the murder, with Cherry using a .38 caliber revolver while Ross shot with a .40 caliber pistol.  Tr. 75:13-76:3; 77:8-78:2.[1]

---

[1] Other evidence of Ross's guilt was overwhelming.  For example, to prove Ross's murder of Williams, the prosecutors introduced evidence of an eyewitness, DNA recovered from a lip balm at the scene that matched Ross girlfriend's, confessions taken by Luberda, motive evidence, evidence recovered from Ross's vehicle that included a firearm, a set of binoculars, narcotics, a ski mask, and plastic ties. Tr. 91:17-93:6.  Luberda also provided information with regard to the Hirt murder; other evidence tying Ross to that crime was a security camera that showed Ross's vehicle pull up before Hirt was killed. Tr. 93:15-94:17.

After confessing to the Williams murder, Cherry appeared to have written letters between approximately December 25, 2011 and January 6, 2012, to a Suffolk County judge, the Honorable James Hudson, copying and sending one of the letters to Biancavilla.  In those letters—all disclosed to Scarpa before the Ross trial—Cherry retreated from the confession and exculpated Ross.  GX 201 (Dec. 25, 2011 letter to ADA Biancavilla, in which Cherry claimed that he and Ross were innocent); GX 202 (same, but sent to Justice Hudson); GX 203 (Jan. 6, 2012 letter to Justice Hudson, in which Cherry stated that "Rameek Mole" and another person killed Williams).

Before proceeding with Cherry's guilty plea, Biancavilla and other members of law enforcement interviewed Cherry about his inconsistent statements.  Tr. 69:4-17; Tr. 82:5-23; GX 204 (Cherry's sworn statement to law enforcement about his letters).  Cherry told them that Ross had directed Cherry to write letters to the judge to exculpate Ross, and that Ross had sent another letter, more recently, with additional instructions.  Tr. 70:1-11; Tr. 84:4-85:6.  An investigator with the Suffolk County Correctional Facility searched Cherry's prison cell and found a letter under his bed that appeared to have been written by Ross (the "Ross Letter"), in which Ross directed Cherry to offer additional false statements.  Tr. 70:17-21; 85:9-87:19; GX 205.[2]  This letter—which had also been produced to Scarpa as written by Ross—showed that the writer knew the contents of Ross's vehicle when it was searched by law enforcement, Tr. 85:22-86:7, and knew about Cherry's cases, Tr. 86:12-25.  The letter promised that if Cherry provided another notarized statement taking responsibility for the weapon recovered from Ross's car, Cherry's "name will be super good again" and the writer (Ross) would "help with getting some paper for [Cherry] for a lawyer."  Tr. 87:12-19; GX 205.

---

[2] The Ross Letter was received in evidence to show Scarpa's knowledge and intent, but not for its truth.

Cherry gave yet another account at his December 5, 2014 sentencing, just days before the Ross trial began.  Tr. 87:20-90:12; GX 210 (minutes from Cherry's sentencing). Cherry was sentenced to a prison term of 23 years to life, which ran consecutively to the 40-year-sentence he received for his unrelated murder and firearm possession in Queens.  Tr. 88:5-22; Tr. 90:8-12; Tr. 102:18-103:13.  At sentencing for the Williams murder, Cherry asked to withdraw his plea, stating, "I didn't do nothing."  GX 210; Tr. 89:19-23.

But at the Ross trial as Scarpa's witness, Cherry gave a fourth account, one that incriminated himself, exculpated Ross, and navigated around other evidence introduced at trial. Tr. 59:5-10; GX 206 (Cherry's testimony at the Ross trial).  Cherry testified that he borrowed Ross's red Ford to commit the murder to explain why an eyewitness recalled seeing an out-of-place red Ford Explorer parked on the morning of the murder.  Tr. 62:18-63:7.  Ross owned a red Ford Explorer, but Cherry insisted that Ross was not with him.  Tr. 63:10-15.  As another example, to account for ballistic evidence that showed two guns were used—consistent with Cherry's confession, in which he described Ross shooting one of the firearms, Tr. 78:4-11; GX 200, at 3—Cherry testified at trial that he had a handgun in each hand, and that he inexplicably kept firing the gun that was jamming.  Tr. 64:2-20.  Prompted by Scarpa, Cherry also came up with his own motive for killing Williams, one that did not involve Ross.  Tr. 64:21-65:5; Tr. 110:6-111:10 (explaining that there was no evidence supporting Cherry's purported motive that Scott Williams had shot Cherry's brother).  And because Cherry's latent prints were lifted from a Newport cigarette box found at the scene, Cherry did not claim at trial—like he did at sentencing just months earlier—that he was innocent.  Tr. 78:24-79:5.  Nor did Cherry mention "Rameek Mole," as there was no evidence about his involvement offered at trial.  Tr. 80:11-15.

4

Scarpa knew that Cherry's testimony was not only helpful to the defense but was also entirely inconsistent with Cherry's post-arrest statements and admissions at his plea hearing. Tr. 65:6-66:18.   Scarpa's direct-examination also allowed Cherry to explain away his prior inconsistent statements that inculpated Ross.  Tr. 111:18-112:8 (quoting GX 206, where in response to Scarpa's question, Cherry stated that he had lied about Ross because he was "mad" at Ross); Tr. 112:20-113:7 (quoting GX 206, where Scarpa asked Cherry to explain his statement to law enforcement about following Ross's directions to exculpate him); GX 113:8-114:16 (quoting GX 206, where Scarpa asked Cherry to explain his statements at the plea, during which he incriminated Ross).

Before Cherry testified, and when Scarpa still believed Gallman's January 13, 2015 visit to Cherry was secret, Scarpa made a record as to why he chose to have a bench trial.[3] See GX 206, at 1867:20-25.  He explained that it was primarily his decision—not his client's— to have a bench trial, see GX 206, at 1869:14, and it was driven by the judge's ability to treat Cherry's prior statements that inculpated Ross (i.e., Cherry's confession and plea to the Williams murder) as merely impeachment material, rather than as direct evidence, see GX 206, at 1867:23-1869:9.  In other words, Scarpa anticipated that Cherry's trial testimony would be inconsistent with his statements that incriminated Scarpa's client but it was the trial testimony alone that Scarpa wanted the fact-finder to treat as direct evidence, offered for its truth.  Tr. 105:4-15. Scarpa represented to the court that he had "deep and long conversation[s]" with his client for "many months" about this strategy.  GX 206, at 1869:20-24.

---

[3] Defendants in New York have the absolute right to waive jury trial, except in cases charging first-degree murder.  See N.Y. Crim. Proc. Law § 320.10; People v. Davis, 49 N.Y.2d 114, 119 (1979) ("It can no longer be disputed that defendant had a constitutional right to waive trial by jury[.]").  Ross was charged with second-degree murder.

During trial, Biancavilla received information from the Queens County District Attorney's Office about Scarpa's efforts with Gallman to bribe Cherry.  Tr. 96:15-97:8.  He listened to one intercepted telephone call in which Gallman told Scarpa, after visiting Cherry, that Cherry will "play it" however Scarpa wanted, and there was a list of things he wanted:

| | |
|---|---|
| Gallman: | Just came off the visit.  Boy, listen. |
| Scarpa: | Yeah. |
| Gallman: | *I think you ok.* |
| Scarpa: | Yeah? |
| Gallman: | *Anything we need, he's willing.  Whichever way you wanna play it, he's willing.* |
| Scarpa: | *Okay.* |
| Gallman: | Ok, I'm getting ready to head back now.  I'll be back – you in the office? |
| Scarpa: | No, I'm out in court, in Riverhead. |
| Gallman: | Oh, you at—oh, I caught you—lunch just started, huh? |
| Scarpa: | Just started. |
| Gallman: | I just left the visit. |

* * *

| | |
|---|---|
| Scarpa: | *So this guy is willing to do whatever?* |
| Gallman: | *Whatever you need, John.  Whatever you need.* |
| Scarpa: | *Ok.  You got it.* |
| Gallman: | *Whatever you need.  I got a bunch of stuff I wrote down that he wants.*  I, cause I don't think—now, it's something about a, a Newport pack. |
| Scarpa: | Right. |

6

| Gallman: | Right.  That his DNA is on. Right? |
|---|---|
| Scarpa: | Yeah? |
| Gallman: | Yeah.  Well, I—well, I—well, I wrote a bunch of stuff down. So, I'll be able to give it to you when I get there. Okay? |
| Scarpa: | Okay. |
| Gallman: | I'm coming in today, so I'll have to see you that—and I'm gonna text you everything. |
| Scarpa: | Okay. |

GX 10T (emphases added).

Armed with this call and information about Gallman's visit, Biancavilla began to raise the issue, which prompted a discussion with the presiding judge, Biancavilla and Scarpa. The judge inquired if Biancavilla had a "good faith basis to make assertions that somehow somebody from the Crips has communicated with [Cherry] and either offered him some sort of payoff or made some sort of threat implicit or explicit to this witness?"  Tr. 164:23-165:2 (quoting GX 206, at 2112:12-17).  When Biancavilla answered affirmatively, Scarpa, who knew Gallman was not affiliated with the Crips, weighed in, "A Crip? . . . .You heard the judge's question, a Crip."  Tr. 165:22-23 (quoting GX 206, at 2112:19-22).

Biancavilla ultimately cross-examined Cherry about having been visited by Gallman.  Tr. 160:24-162:3.  Scarpa was visibly shaken as Biancavilla began this line of cross-examination.  Tr. 168:25-169:8.  He began to furiously text-message Gallman, asking about the timing of his visit.  See GX 23T-27T.  When Scarpa finally reached Gallman by telephone, Scarpa exclaimed, "Yeah, you're letting my balls hang out in the wind!  I'm fucking texting you, I'm in court, I need to know an answer and, and I got no text back from you!" GX 28T, at 2:12-

7

14-.  He also demanded to know if Gallman's visit with Cherry was "fucking recorded in any way."  Id at 3:13.

Back in the courtroom, Scarpa went into self-preservation mode.  Having offered Cherry's testimony for its truth, built his strategy for waiving a jury trial on the idea that the Ross-exculpating testimony offered by Cherry would be credited, Scarpa began telling the judge that he had always wanted Cherry exposed as a liar.  In summation, he argued that Cherry was full of "stupid haughty inconsistent tales," and that the judge could "tell Luis Cherry was lying because his lips were moving."  Tr. 272:24-273:16; 273:17-21.  See also Tr. 275:2-14.  This was the first time during trial that Scarpa argued Cherry should not be believed.  Tr. 355:5-10.

As discussed in more detail below, the intercepted communication the government introduced at trial (along with other evidence) showed that (1) the idea to offer Cherry as a witness and mold his testimony came not from Cherry, but from Ross's defense team, see GX 6; (2) Scarpa believed he needed help winning one of the murders, see GX 6; GX 18; (3) Gallman went to visit Cherry intending to offer him a benefit, see GX 6; (4) Scarpa knew about the purpose of Gallman's visit, see GX 28; (5) Cherry knew Gallman was in a position to offer him a benefit, see GX 206, at 2133; GX 300; (6) Gallman offered Cherry a benefit for his testimony, see GX 13; GX 14; (7) Cherry agreed to testify any way Scarpa wanted him, see GX 11; (8) when Scarpa offered Cherry's testimony at trial, Scarpa knew it was false and beneficial to his case and knew that Cherry was expecting a benefit, see GX 10; and (9) when Scarpa and Gallman's scheme was exposed, Scarpa's conduct showed a consciousness of guilt about Cherry's benefit, see GX 28; GX 29.[4]

---

[4] Although not relevant to the issues in his motion, Scarpa is wrong when he states that the warrant affidavits submitted by the Queens District Attorney's Office did not "allege any criminal activity on the part of Mr. Scarpa."  Mot. 4, n.1.  A March 6, 2015 affidavit from Assistant District Attorney Bradley Chain, for example, explicitly stated that there was probable cause to believe that Scarpa (and

ARGUMENT

I.    Applicable Law

    A.    Rule 29

Rule 29 of the Federal Rules of Criminal Procedure requires a court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). There is a "very heavy burden placed upon a defendant challenging the sufficiency of the evidence underlying a conviction." United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994) (affirming this Court's denial of a Rule 29 motion). As a result, motions challenging the sufficiency of evidence "rarely carry the day." United States v. Tillem, 906 F.2d 814, 821 (2d Cir. 1990). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (quotation marks omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the government. See United States v. Temple, 447 F.3d 130, 136-37 (2d Cir. 2006). A reviewing court must analyze the pieces of evidence "in conjunction, not in isolation," United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011) (quotation marks omitted), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," United States v. Riggi, 541 F.3d 94, 108 (2d Cir. 2008) (quotation marks omitted). The Court must

---

others) were committing the state crime of bribing a witness. The warrant order signed by a state justice adopted this allegation.

"credit[] every inference that the jury might have drawn in favor of the government," Temple, 447 F.3d at 136-37 (quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001).  "In order to avoid usurping the role of the jury, courts must defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony when reviewing the sufficiency of the evidence."  United States v. Triumph Capital Grp., Inc., 544 F.3d 149, 158-59 (2d Cir. 2008) (quotation marks and citations omitted).

 B. Rule 33

  To grant a Rule 33 motion, "[t]here must be a real concern that an innocent person may have been convicted."  United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted)).  Ordering a new trial is an extraordinary remedy that is "disfavored in this Circuit," and, as a result, "the standard for granting such a motion is strict."  United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995).  See also United States v. Mazella, No. 11-cr-300 (CBA), 2012 U.S. Dist. LEXIS 84234, at *2 (E.D.N.Y. June 15, 2012) (comparing standards used for reviewing Rule 33 and Rule 29 motions and noting that both are "similarly strict," even if the former allows the district court to "itself weigh the evidence and the credibility of witnesses" (internal quotation marks omitted)).

  A district court "must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).   A trial court's decision is reviewed for abuse of discretion, id. at 124, which is "broad," "and its ruling is deferred to on appeal because, having presided over the trial, it is in a better position to decide what [the] effect . . . might have [been] on the jury," Gambino, 59 F.3d at 364.  See also United States v. Serafin, 391 F. App'x 973, 975 (2d

Cir. 2010) (affirming this Court's denial of a Rule 33 motion, "detect[ing] no error, let alone an abuse of discretion" (internal quotation marks omitted)); United States v. Vaval, 209 F. App'x 24, 25 (2d Cir. 2006) (same, even where this Court observed that a witness gave inconsistent testimony).

Despite this wide discretion, a district court "may not wholly usurp the jury's area of responsibility, and it is only 'where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" United States v. Pinero, No. 12-CR-695 (ENV), 2014 U.S. Dist. LEXIS 200313, at *11 (E.D.N.Y. Apr. 20, 2014) (quoting United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000)). See also United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (reversing grant of new trial based on trial court's determination that government witnesses gave perjured testimony).

II. Analysis

A. The Jury Was Not Irrational in Convicting Scarpa of Count Four (Substantive Travel Act Violation)

Read liberally, Scarpa argues that no rational jury could find that Cherry was offered a benefit or that Scarpa knew about that benefit when Cherry perjured himself at the Ross trial. See Scarpa's June 3, 2019 Motion ("Mot."), ECF Dkt. No. 223, at 6-20. The argument asks the Court to ignore evidence and draw inferences that are not just unfavorable to the government but, at times, defy logic. The direct and circumstantial evidence presented at trial— which must be credited and viewed together—support the jury's verdict. The jury was not irrational in convicting Scarpa.

1. Scarpa Wanted Cherry's False Testimony

Despite Scarpa's assertions to the contrary, Mot. 14-15, the jury learned that the idea for Cherry to testify falsely at the Ross trial did not come from Cherry; it came from

11

Gallman, and was approved by Scarpa.  On January 12, 2015—as the Ross trial was already underway and the day before Gallman's visit to Cherry—Gallman told "YKim" that he would go see Cherry to see if he "wanna do the right thing."  GX 5T, 2:31-32.  See also GX 7T (Gallman text-messaging "El-Rahim," Ross's uncle, stating that he believed he could "make this kid do the right thing").  Gallman also told El-Rahim that he "thought of a motherfucking shit today," and then previewed for El-Rahim the testimony that he had in mind for Cherry.  GX 6T, 2:26-39.  Gallman said Scarpa ("the lawyer") believed "they'll fall out" if Cherry "could pull that off."  Id.

In addition to these statements by Gallman, the jury had other evidence from which it could infer, even as early as these calls, that the plan to induce Cherry to testify falsely was not Gallman's alone; it involved Scarpa.  Gallman told El-Rahim that Ross was going to "win one [murder]" and "lose one."  GX 6T, at 3:31-35.  And it was for the Williams murder that the defense was weaker ("the one he's gonna win, that ain't the one they got Luis [Cherry] for, [i.e., they would win on the Hirt murder and lose the murder in which Cherry was involved, the Williams murder]").  That belief about the strengths and weakness of the defense, recited by Gallman, actually came from Scarpa.  In a later call with Scarpa, Gallman said, "[I]t's gonna play out just like you said—he's gonna win one and lose one."  GX 18T, at 2:11-12 (emphasis added).  Scarpa did not dispute he had said this before, and added, "[I]f I can win the other one appeal, you know . . . [then] we saved him.  And that's what I'm hoping to do."  GX 18T, at 2:11-19.

These communications, coupled with Scarpa's statement to Justice Condon that he had decided on a bench trial after discussions with Ross over "many months" to protect Cherry's anticipated testimony, showed Scarpa's involvement from the start.  GX 206, at 1869:21.  Indeed, when Gallman went to visit Cherry, Gallman kept Scarpa updated.  He called

12

Scarpa, though Scarpa's son picked up, and left a message that he was "a half hour from this jail" and would "fill him in" when Gallman was finished.  GX 8T, at 2:7 & 2:21. Scarpa tried to reach Gallman, unsuccessfully soon thereafter, but Gallman appeared to have already been inside the jail.  See GX 9T.

This evidence permitted a rational jury to infer that when Gallman went to secretly visit Cherry, Scarpa was waiting to hear back because he knew Gallman intended to manipulate Cherry's testimony, and Scarpa needed Cherry to testify in a way that exculpated Ross on the murder Scarpa felt vulnerable.[5]

### 2.   Scarpa Knew What Cherry Wanted for His False Testimony

The jury learned that Scarpa knew what Cherry wanted in return for false statements.  The Ross Letter—allegedly written by someone who had succeeded in convincing Cherry to make false statements, and disclosed to Scarpa—promised Cherry two things in return for yet another false statement that would have exculpated Ross:  making Cherry's name "super good again" (after having cooperated against a gang member) and "some paper [i.e., money] for you for a lawyer."  GX 205.

Although Scarpa was the one who received the Ross Letter in discovery, Gallman, not surprisingly, also knew what Cherry wanted.  If Cherry gave the Ross defense team what they needed, Gallman explained to El-Rahim, then Cherry "could get all the prestige in the world 'cause I'll spread the word throughout the system: this n**** here is great."  GX 6T, 3:1-2.

---

[5] The jury knew that Gallman worked in Scarpa's office, Tr. 437:10-13, and in fact heard Scarpa in the background during some of the calls, Tr. 487:17-25; 499:10-14.   It also knew that the two referred to each other as "brothers," see, e.g., 3T, 4T, spoke incessantly not just during the Ross trial, but in all, had about 376 calls over the course of the wiretap, which amounted to about two calls per day, Tr. 535:9-13.  See also 21T, 22T (Scarpa asking Gallman if he is "ok" because he was not immediately responding to Scarpa).  With this background, it was obvious why Gallman did not have to explain to Scarpa what jail he was off to in the middle of their double-homicide trial—Scarpa already knew.

Notably, El-Rahim did not ask Gallman how it was that he could spread "prestige" in the prison system.  The jury had reason to know why Gallman expected others to know about his reputation:  he was a life-long criminal, having been arrested 17 times, including for two murders, and spent much of his adult life in prison.  See GX 300.

  3.  Scarpa Is "Okay" Because Cherry Will Play It How He Wanted

    There was no dispute that Gallman in fact visited Cherry.  See, e.g., Tr. 639:7-8.  Immediately after the visit, Gallman told Scarpa, "I think you okay."  GX 10T, at 2:11.  The jury learned that Scarpa's trial strategy in Ross—including his surprising decision to waive a jury—hinged on helpful testimony from Cherry to win on the stronger murder charge.  But Cherry's past accounts were not helpful because none accounted for the physical evidence introduced at trial.  The most logical, and certainly permissible, interpretation of Gallman's statement that Scarpa was "okay" (and the fact that Scarpa needed no clarification as to what Gallman meant by that statement), was that Cherry agreed to give the type of false account that could help Scarpa win.

    That interpretation was reinforced as the jury continued to listen to the call.  Gallman added, "Anything we need, he's willing. Whichever way *you* wanna *play* it, he's willing."  GX 10T, at 2:15-16 (emphasis added).  For all of Scarpa's talk about the absence of a "smoking gun" or direct proof, Mot. 5, 14, it is hard to imagine a more incriminating statement in a bribery case.  Gallman told Scarpa that Cherry was willing to allow Scarpa ("you") to choose how to have him testify ("play it").  Gallman delivered this news in a low, sinister tone, which he quickly changed when he moved onto a different topic, further underscoring the criminal nature of his statement.[6]  Scarpa, who was in the Riverhead courthouse eating his lunch

---

[6] The government will submit to chambers a disk containing all the calls, so that the Court can, for itself, once again evaluate the tone of the conversations.

and likely did not want to discuss the details of the bribery, responded in the affirmative, stating, "Okay." GX 10T, at 2:18. But he was clearly interested because he returned to the topic of manipulated testimony later in the conversation. After discussing other clients, Scarpa asked Gallman, "So this guy's willing to do whatever[?]" GX 10T, at 4:5. Gallman confirmed, and stated that Cherry "got a bunch of stuff I wrote down that he wants." GX 10T, at 4:11. After a brief pause, Gallman started discussing the Newport pack that Cherry referenced in their meeting as one tying him to the Williams murder, which he would need to account for in his testimony to successfully exculpate Ross. See GX 10T, at 2:12-13.

In short, in this call, Gallman told Scarpa that Scarpa's trial strategy was safe, Cherry was willing to testify however Scarpa wanted him, but Cherry expected a benefit in return (a "bunch of stuff . . . that he wants"). This call occurred after communications quoted above before Gallman's visit in which Gallman relayed his intention to offer Cherry a benefit (prestige in the prison system) in exchange for his testimony. The call with Scarpa left no doubt that during the visit Gallman and Cherry discussed the Williams murder because Gallman also mentioned a Newport cigarette pack, which was the critical piece of evidence tying Cherry to that crime. Gallman indicated that he had no idea about the significance of the Newport cigarettes, but Scarpa's reaction confirmed he knew exactly what Cherry meant, and by the time Cherry testified, his testimony would be properly molded to account for those cigarettes.

This call, coupled with the undisputed facts that (1) Scarpa met with Cherry, who was represented by counsel, prior to trial and (2) that Cherry perjured himself at trial while (3) offering Scarpa helpful testimony, are by themselves sufficient for a rational jury to have found Scarpa guilty of both counts. Even counsel at trial allowed that "you would be justified in the first reading [of GX 10T] that . . . [t]hey're bribing him. This is what he wants." Tr. 637:10-

15

11.  It was only the deeper analysis that counsel invited the jury to perform that dispel this natural (i.e., rational) conclusion.

The defense's attempts to explain away the call are no more persuasive today than they were at trial, which the jury soundly rejected.  At trial, counsel repeatedly set up a strawman argument the government never made—that the Newport cigarettes were the benefit the government thought Gallman offered Cherry.  Tr. 31:11-20; Tr. 553:7-9; 637:23-638:6.  Counsel did so by avoiding playing the call and relying instead on the transcript, in which Gallman's statement about "stuff" that Cherry wanted and the Newport cigarette are not separated by an obvious pause and change of pace, but by "odd punctuation."  Tr. 637:16.  Scarpa has refined that argument in his motion, writing that the "call clearly states what Cherry wants if he is called to testify, namely a cigarette pack with DNA on it, i.e. a piece of evidence."  Mot. 6.

There is no reasonable interpretation of the audio that would lead a jury to conclude Cherry was requesting a piece of evidence from the trial, a nonsensical request for a defendant who had already been sentenced for that crime.  Even if this interpretation were plausible, the "government's evidence need not exclude every other possible hypothesis."  United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008).  Scarpa was on notice that Cherry had requested a "bunch of stuff" in return for his testimony for Scarpa.

Scarpa's second argument about this call focuses on the "list of things" that Gallman said he would "be able to give . . . to [Scarpa] when I get there."  Mot. 5; GX 10, at 4:22.  It was undisputed at trial that immediately after this call, Gallman traveled straight back to Scarpa's office, where Gallman said he would "be able to give [the list of things Cherry wanted] to [Scarpa] when I get there," GX 10-T, at 4:21-22, see GX 10M; GX 11M; Tr. 463:8-464:18.  The defense continues to focus on the Queens District Attorney Office's ("QCDA") inability to

16

intercept any picture text messages over the course of the wiretap. Tr. 421:24-422:3; 461:3-6. All this meant is that if Gallman did indeed send Scarpa the list of "stuff" Cherry wanted (rather than hand it to him in person as he said he would), the QCDA would not have intercepted it. Scarpa argues that the absence of this list undercut the government's proof of the bribe. Mot. 5, 14. But as the Court instructed the jury, Tr: 676:20-677:4, the government was not required to produce all items of potential evidence at trial, and the absence of this list was a fact that counsel was entitled to (and did) argue to the jury, but not one that the jury was required to accept.

Realizing the impact of this call on his sufficiency argument, Scarpa also attempts to isolate it, and have the Court consider it in a vacuum, removed from other evidence, so that the call would be more susceptible to a different (if unpersuasive) interpretation. He had extended the same invitation to the jury. But while the jury had the option to accept it—though it clearly declined—the Court does not. See Persico, 645 F.3d at 104 (holding that on a Rule 29 motion courts must analyze evidence "in conjunction, not in isolation"). Later communications, for example, further confirmed that: (1) Gallman's visit with Cherry was about manipulating his testimony, (2) Cherry expected and Gallman offered him a benefit, and (3) Scarpa was involved in the scheme. See, e.g., GX 11T (Gallman telling Crystal Cincotta that Cherry "will do whatever *we* need him to do" and adding that he did not "trust" her phone (emphasis added)); GX 12T, at 2:21-28 (Gallman telling Cincotta "this is beautiful . . . this kid here—" and Cincotta immediately telling Gallman to call Scarpa); GX 16T (Gallman telling Rose Barrett that Cherry "will do whatever *we* want him to" (emphasis added))); GX 17T, at 3:22-24 (Gallman telling Cincotta, in discussing Cherry, that "I know some shit that *we* are going to implement [at the Ross trial]" (emphasis added)).

Scarpa offers two responses to this additional proof.  *First*, he wants the Court simply to ignore it because in it Gallman—inconveniently for Scarpa—implicitly referred to Scarpa ("we") when discussing their plans for Cherry's testimony.  Gallman, Scarpa writes in his motion, "does not at any time during discussions about helping Cherry with his case say 'we' or 'us.'"  Mot. 7.  As the above-quoted communications shows, that statement is simply false. Instead of these calls and text messages, Scarpa wants the Court to look only at two communications in which Gallman answered "Box's" question as to what Cherry wanted from Gallman in return for favorable testimony.  Mot. 7 (citing GX 13T and 14T).   This conversation with Box, however—even if improperly considered in isolation—does not exclude Scarpa from the scheme.  In any event, while he could have asked the jury to place less weight on evidence that was less helpful to his theory of the case, he does not get to do that on a sufficiency claim. See, e.g., Triumph Capital Grp., Inc., 544 F.3d at 158-59 (courts must defer to the jury's assessment of credibility and resolution of conflicting evidence).

*Second*, Scarpa argues that Gallman's statements were all "hyperbole" Mot. 5, "typical elaborate and exaggerated," id., "embellishments," id., "bluster[]," Mot. 9, and examples of Gallman "bragging to everyone who would listen," Mot. 17.  Just like with the above-quoted calls, Scarpa wants the Court to ignore, or at least discount, Gallman's words.   The argument was appropriately made to the jury, Tr. 615:1-5; 634:17-19, and, just as appropriately, rejected. Following a guilty verdict, on a Rule 29 motion, the Court cannot disregard this evidence.  See Triumph Capital Grp., Inc., 544 F.3d at 158-59; Temple, 447 F.3d at 136-17 (the evidence must be viewed in light most favorable to the government and credit every inference in its favor).

18

4.      Benefits Conveyed

Scarpa knew that when he offered Cherry's perjurious (and helpful) testimony, that Cherry was allowing him to "play it" Scarpa's way, in return for an expectation of "stuff" Cherry wanted.  Before he testified, Cherry met with Scarpa for approximately 20 minutes, just long enough to tell him what version of the fake account to go with, but nowhere long enough to go through Cherry's recollection of the murder or his many prior statements.  Tr. 396:17-399:20; Tr. 654:21-656:14.  Notably, Scarpa violated prison rules by meeting with an inmate he did not represent.  Tr. 390:15-21.[7]

In addition to this evidence, the jury learned about the two specific benefits that were offered to Cherry: a reputational benefit in prison, and promise of help with his appeal. With regard to the "prestige" (or "super good name") benefit, which Scarpa knew Cherry wanted from the Ross Letter, Scarpa had reason to believe Gallman had offered it.  At the Ross trial, Cherry admitted that the man who visited him, whom he only knew as "T," told Cherry he "spent most of his adult life in prison" and had been convicted of manslaughter.  Tr. 2133:15-21.  Given (1) Gallman's stated intent for the visit—GX 6T, at 3:1-2 ("I'll spread the word throughout the system: this n**** here is great")—and (2) evidence of the two benefits Scarpa and Gallman thought Cherry wanted, a rational jury could have easily inferred that the only reason Gallman and Cherry were discussing Gallman's criminal history during the visit was for Gallman to explain what he could do for Cherry if he testified.  And Scarpa knew that such a benefit would be extremely enticing to someone in Cherry's position, i.e., a Crip gang member who had (at

---

[7] The jury might have considered the cross-examination that suggested this rule was unfair or non-existent.  Tr. 400:17-401:9.  The Court, however, is undoubtedly aware that no attorney should meet with a represented party without going through that party's counsel, particularly when the party is a criminal defendant convicted of two murders, with both appeals pending, and the attorney initiating the meeting represents a co-defendant and wants something that is diametrically opposed to that party's interests.

least initially) cooperated against another Crip.  See Tr. 195:24-196:6 (evidence of Scarpa reminding another Crip member, Melvin Anderson, that it is "especially bad" for a Crip to cooperate against another Crip); see also GX 205 (Ross Letter, produced to Scarpa, stating that Cherry's name will be "super good again" if he tried to exculpate Ross).

There was also evidence that Gallman offered the "appeal" benefit and that Scarpa knew about that benefit too.  In a conversation with "Box" the day after the visit, Gallman explained that Cherry was ready to testify falsely for them ("flip back") but "only if you [i.e., Gallman] promise to help me with the case."  GX 14T, at 2:25-26.  Gallman accepted: "I said 'Sure, I'm gonna help you with the case man. . . . You rat motherfucking bastard!'"  GX 14T, at 2:26-27, 31.  See also GX 13T, at 2:21-23 ("Box" wondering what Cherry wanted from Gallman).

Crucially, Scarpa admitted in an intercepted call that he knew Gallman was prepared to offer Cherry help with his appeal.  Discussing the visit with Cherry that had been exposed on cross-examination and preparing for the possibility of explaining it in court, Gallman said, "Yes, somebody contacted me to go up there and see Mr. Cherry and talk to him about his case and possibly *helping him with his appeal*."  GX 28T, at 5:25-27 (emphasis added).  In a rare moment of candor, Scarpa, in a different tone than the rest of their conversation, responded, "Well, that's true."  GX 28T, at 5:29.  See Tr. 600:13-23 (government's summation argument about this portion of the call).

In short, Scarpa knew the two benefits Cherry wanted, knew that Gallman discussed them during the visit, knew that Cherry was willing to let him "play it" how he wanted in return for a benefit, and knew that Cherry was compliant and perjurious when he testified. The mix of direct and circumstantial evidence was more than sufficient to prove the benefit

element, despite Scarpa's repeated demands for more explicit proof.  Compare United States v. Friedman, 854 F.2d 535, 554 (2d Cir. 1988) ("[E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions."); United States v. Rosen, 716 F.3d 691, 702 (2d Cir. 2013) ("We have never required direct evidence of the quid pro quo."), with Tr. 550:3-5 (counsel arguing insufficient evidence because "there is no direct evidence of an agreement, no smoking gun call where Gallman and Scarpa say, let's agree we are going to bribe Cherry").[8]

Scarpa persists on pointing to the notices-of-appeal that Cherry's court-appointed lawyers filed on his behalf.  Mot. 16.  The Court should have an even easier time rejecting this argument than did the jury.  To credit Scarpa's argument that this meant that Cherry did not desire any help with his appeals, the jury would have had to have ignored Gallman's statement after the visit that Cherry was willing to "flip back" only if Gallman promised to help him with his appeal.  See GX 14T, at 2:24-27.  In addition to ignoring evidence, the jury would also have had to have simply assumed, without any basis, that Cherry was entirely satisfied with one court-appointed lawyer per case and was resolutely opposed to additional help, especially from someone who was at liberty despite having been arrested for two murders.  See GX 300.  Although the jury might have had the option to accept Scarpa's argument, it certainly was not required to do so.

For the prestige benefit, Scarpa again dismisses Gallman's talk as simply "bragging" and his offer as "outlandish," because a cold-stone killer like Cherry, he says, was

---

[8] See also United States v. Yaron, No. 10 Cr. 363 (GBD), 2012 U.S. Dist. LEXIS 92451, at *7 (S.D.N.Y. June 28, 2012) (Defendants argue that there was no evidence submitted at trial of a quid pro quo . . . . However, a 'jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation.'" (quoting Eppolito, 543 F.3d at 45)).

not someone who needed protection in prison.  Mot. 17-18.  The jury was entitled to reject this argument, which contradicts the evidence at trial—including Gallman's and Scarpa's own statements, and the Ross Letter—as well as common sense (to say nothing of realities in prison).  A killer who is disarmed, surrounded by other violent criminals, Tr. 621:16-17, with a target on his back because, as Scarpa liked to remind Crip members, he "snitched" on a fellow Crip, Tr. 195:24-196:6, could well be looking to gain back his "prestige," particularly since there was indication that he wanted his name to be "super good again," GX 205; see also Tr. 468:4-19 (testimony regarding informants facing retaliation in prison).

Scarpa also argues that there was no proof he "authorized, instructed, or even knew Gallman" offered this benefit.  Mot. 17.  The discussion above shows that Scarpa knew about the benefit.  As for whether Scarpa authorized or instructed Gallman to offer it, the jury could well have drawn the inference that Scarpa sent Gallman to do this bidding, but it did not have to do so, for two reasons.

*First*, Scarpa was charged, in the alternative, with aiding and abetting the Travel Act violation.  As a result, the government only had to prove that Scarpa intentionally aided Gallman in the commission of the offense.  See ECF No. 74, ¶ 6; Tr. 561:19-23 (government's argument for aiding-and-abetting liability); Tr. 686:20-689:22 (Court's jury charge).   The jury could have found that Scarpa aided and abetted Gallman by putting Cherry on the stand to lie, thus completing the *quid pro quo*, all while knowing that Cherry was expecting a benefit.

*Second,* even principal liability did not require Scarpa to have instructed or authorized Gallman to act; all that was required was Scarpa's "unilateral perception or belief" that Cherry's testimony was influenced by the expectation of a benefit.  Tr. 686:3-5 (Court's jury charge).  See also People v. Shaffer, 130 A.D.2d 431, 432 (App. Div. 1st Dep't 1987) ("All that

is required for a bribery to be complete is the offer or agreement to confer a benefit upon the

defendant's agreement or <u>understanding</u> that the witness's testimony will thereby be influenced."

(emphasis added)); N.Y. Penal Law § 215 (providing that a person is guilty of the substantive

offense if he "offers or agrees to confer[] any benefit" on a witness).  In short, the jury could

have found that Scarpa masterminded the Cherry scheme, but it did not have to.  Knowledge and

active participation were sufficient to convict him.

5.   <u>Cherry Provided Helpful, Perjurious Testimony for Scarpa</u>

Although both the substantive and conspiratorial crimes were complete when

Scarpa met with Cherry after having discussed the crime over a cell phone, <u>see</u> <u>United States v.</u>

<u>Salameh</u>, 152 F.3d 88, 152 (2d Cir. 1998) (summarizing the elements of the Travel Act), the jury

learned additional critical information:  Cherry indisputably testified in a way that was helpful to

Scarpa, and, also indisputably, <u>see, e.g.</u>, Tr. 643:5-19, perjured himself while doing so.  Notably,

this false testimony was different from the testimony Gallman had in mind before he went to

visit Cherry, that "Kyle Greening shot the motherfucking people."  GX 6T, at 2:36.  Instead, as

set forth above, Cherry's testimony—prompted by Scarpa's questions—steered around the proof

which Scarpa knew because he had received it in discovery and saw the evidence that was

presented at trial.  That was yet another reason for the jury to conclude that Scarpa was involved

in the bribery scheme.

The false testimony was also a reason for the jury to find that a benefit was

conferred on Cherry.  <u>See, e.g.</u>, Mot. 9-10 (repeatedly arguing that there is no such evidence).

The jury learned that Gallman went to visit Cherry ready to offer at least one of the two benefits

(prestige) Gallman and Scarpa knew, from the Ross Letter, Cherry wanted.  <u>See</u> GX 205; GX 6T,

3:1-2.  Following the visit, Gallman identified the second benefit (appeal help) as the one that

23

Cherry said he absolutely needed for him to be willing to testify; Gallman added in the same call that he agreed to give Cherry this benefit ("I said 'Sure, I'm gonna help you with the case man'").  See GX 14T, at 2:25-27.  And Cherry did testify, falsely and helpfully (for Scarpa), meaning that at least one of the two benefits—and likely both—had been offered to Cherry. Simply put, that Cherry performed the "quid" is powerful evidence of the existence of Scarpa's and Gallman's "quo."  See United States v. Silver ("Silver I"), 184 F. Supp. 3d 33, 44-45 (S.D.N.Y. 2016), aff'd in relevant part, 864 F.3d 102 (2d Cir. 2017), cert. denied, 138 S. Ct. 738 (2018) (affirming honest services bribery conviction because "there was sufficient circumstantial evidence for a rational juror to conclude" that there was an illicit arrangement given, among other things, the timing between the "quid" and the "quo").

        Scarpa suggests that Cherry was always a willing participant, and did not need to have been bribed to lie on the stand.  See Mot. 15.  This argument does not preclude the jury's finding to the contrary.  Scarpa elides the details of Cherry's false testimony, which was different from his prior statements, including his most recent one at his own sentencing, as only Cherry's trial testimony accounted for the physical proof in the Ross trial.  In any event, even if Cherry would have helped Ross without being offered any benefits, Scarpa would still be guilty of the same crime because, as set forth above, the focus is on Scarpa's "unilateral perception or belief." Tr. 686:3-5.  Cf. United States v. Silver, No. 15-CR-93 (VEC), 2018 U.S. Dist. LEXIS 158216, at *26 (S.D.N.Y. Sep. 17, 2018) ("[A] public official who solicits a bribe to do something good that he intends to do anyway is just as guilty of bribery as a public official who solicits a bribe to do an evil act that he would not do but for the bribe."); United States v. Quinn, 359 F.3d 666, 675 (4th Cir. 2004) ("[I]t does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations."); United States v. Grace, 568 F. App'x

24

344, 350 (5th Cir. 2014) ("It is enough that Grace took the money with the knowledge that it was intended to influence him, even if he would have written the Letters without the payment."); United States v. Boyland, No. 11-CR-850 (SLT) (E.D.N.Y. July 10, 2017), Jury Instructions, dated Mar. 4, 2014, (ECF Dkt. No. 159-1), aff'd, 862 F.3d 279 (2d Cir. 2017).

6.     More Circumstantial Proof: Consciousness of Guilt

While Cherry's false testimony and the admitted communications provided more than sufficient proof to convict Scarpa, the jury had more circumstantial evidence to reinforce its findings.  It had the benefit of learning about Scarpa's reaction after he discovered that Biancavilla knew of Gallman's visit and, potentially, the bribery plot.  Scarpa's conduct showed an unmistaken consciousness of guilt.  See United States v. Gordon, 987 F.2d 902, 907 (2d Cir. 1993) (observing that evidence showing a "consciousness of guilt" can be the type of circumstantial proof used in defeating a Rule 29 motion).

There were a number of specific tell-tale signs revealing Scarpa's knowledge of the criminal nature of Gallman's visit, which in turn, showed that Scarpa knew he was eliciting testimony criminally procured in exchange for an improper benefit.  *First*, when Biancavilla informed the presiding judge, in Scarpa's presence, that Cherry had been offered a benefit, GX 206, at 2033:20-22, and the judge pressed Biancavilla on his order of proof, GX 206, at 2112:12-17, Scarpa's response was informative.  Instead of focusing on the "benefit" part of the judge's question—whether Biancavilla had a good faith basis to believe Cherry had been bribed—Scarpa lasered in on whether Biancavilla was ready to prove it was a Crip (rather than Gallman) who had bribed Cherry:  "A Crip? . . . . You heard the judge's question, a Crip." GX 206, at 221:19-22.  At this moment in the Ross trial, Gallman's name had not been uttered, and yet Scarpa's mind immediately turned to him, as the one person he knew offered Cherry a benefit.

25

*Second*, as Cherry's cross-examination continued, Scarpa—whose demeanor in court had completely changed, Tr. 168:25-169:8—began to frantically message Gallman about his visit.  See GX 23T-27T.  And when Scarpa reached Gallman, one of the first things he wanted to know was whether his visit with Cherry was "fucking recorded in any way."  GX 28, at 3:13.  A reasonable jury could infer that if Scarpa did not know about the criminal nature of Gallman's visit, he would not have reacted the same way.  Scarpa did, after all, elicit on direct-examination that he had met with Cherry twice, GX 206, at 1938:3-7, making another visit by his paralegal, on its face, uneventful.  If Scarpa did not know about the purpose or content of Gallman's visit, he had no reason to react as fervently as he did ("[Y]ou're letting my balls hang out in the wind!" GX 28T, at 2:12).  Nor would he have had reason to be worried about it being recorded.  But Scarpa was indeed concerned—extremely concerned—and his reaction was yet another fact from which a jury could have inferred his knowledge and intent.

*Third*, and most significantly, when Gallman's visit was exposed, Scarpa changed course and threw out his trial strategy, Tr. 355:5-10, which showed just how preoccupied he was about anyone in the Riverhead courtroom uncovering that Cherry had been bribed.  Cherry—who was the first witness Scarpa offered in his case, the witness who Scarpa said was the reason he sought a bench trial (so that Cherry's helpful trial testimony would be the only statements the fact-finder would treat as direct evidence)—was, all of a sudden, a witness who Scarpa told the judge he wanted to be exposed as a liar.  As the government explained during its summation, this marked a drastic change that was completely inconsistent with his prior statements in court.  A reasonable jury could have inferred that Scarpa no longer wanted to be seen as advocating for the truth of Cherry's testimony because he knew it had been bought.

The dramatic switch coincided with how Scarpa began communicating on the phone.  Just a month earlier, Scarpa and Gallman openly prepared Gallman to perjure himself in connection with the testimony of Melvin Anderson, readying Gallman to say he was "presently unemployed" because "of course I can't say I work for you," to which Scarpa responded, "Absolutely."  GX 54T, at 3:5-12.  Even Scarpa now admits that in the same call he discussed "obvious falsehoods" he and Gallman were set to offer in court, Mot. 19, with Scarpa scripting false impeachment material for Gallman, GX 54T, at 6:35-7:13.  But after Gallman's visit was exposed on March 2, 2015, Scarpa's conversations changed.  When Gallman tried to script testimony—as they had done on other occasions—Scarpa cut him off: "We're just going to tell the straight up and down fucking truth like we always do," a demonstrable lie.  GX 28T, 5:11-13.  As for Cherry, Scarpa decided to spell out on the phone to Gallman—a man who needed no introduction to the Ross trial strategy—that, actually, this whole time Scarpa was trying to "prove that this stupid bastard [Cherry] is a freaking liar."  GX 29T, at 2:40-41.  The change of conduct by an experienced criminal defense attorney familiar with wiretaps showed that Scarpa was scrambling to cover his tracks, aware that his conversations might be recorded.

Recognizing how this 180-degree change of strategy revealed Scarpa's guilty mind, at trial Scarpa's counsel attempted to convince the jury that offering a witness for the sole purpose of exposing him as a liar was not all that unusual.  Scarpa's motive, counsel argued, was to show that Cherry's "previous statements against his client Ross were just as unreliable," so that "Cherry would serve as a witness against himself."  Tr. 36:12-17.  See also Tr. 643:5-19.  "John invited him into the trial not as a reliable witness to the truth but as a means of allowing Cherry to undermine his own previous statements against his client."  Tr. 36:4-6.  The jury might have had to struggle unpacking this seemingly intuitive argument, but the Court should have no

trouble seeing through it.

   As an initial matter, the nature of Scarpa's direct-examination and his objections during Biancavilla's cross-examination of Cherry show that Scarpa was—before Gallman's visit was exposed—offering Cherry's testimony for its truth, allowing him to explain away his prior lies, and protecting his credibility.  See, e.g., GX 206, at 1915:16-24 (eliciting from Cherry how he purportedly acted alone in killing Williams); GX 206, at 2010:5-2011:15 (examples of Scarpa's objections to protect Cherry, arguing that Biancavilla was "putting words in his mouth").  And Cherry's prior statements were not part of the trial record in Ross until Scarpa introduced Cherry as his own witness.  Tr. 355:11-14.  Even if Scarpa believed that Justice Condon would violate the rules and go beyond the trial record to convict Ross—for which there is no support in the record—Scarpa can offer no plausible reason as to why he opted for a bench trial.  His only explanation for a bench trial was that it maximized the return from Cherry's direct testimony.  If his goal had always been to neutralize Cherry's prior incrimination of Ross, then Scarpa would have, under his own logic, elected to proceed with a jury, which would have necessarily been limited to the trial record and never would have learned of Cherry's prior statements.

   The only explanation for Scarpa's about-face on Cherry was to distance himself from this witness.  It was self-preservation, and the only reason for Scarpa's need for self-preservation was his knowledge about Cherry's bribe.  See United States v. Bruno, 661 F.3d 733, 744-45 (2d Cir. 2011) (in passing on sufficiency-of-the-evidence claim, holding that "attempt[s] to cover up the extent of his relationship with [the bribe payer]," "efforts to disguise the payment," and "failure to disclose the transaction" were evidence of a quid pro quo); see also Silver I, 184 F. Supp.3d at 46-47 (holding that the jury was entitled to consider the defendant's

false statements in finding his consciousness of guilt in support of a bribery conviction).

Accordingly, the jury did not irrationally convict Scarpa.  Even if it had not drawn every inference in the government's favor—which the Court must assume it did—a reasonable jury would still have found that Scarpa knew that Cherry was testifying falsely because he was expecting a benefit.

B.     The Jury Was Not Irrational in Convicting Scarpa of Count Three (Conspiring to Commit Travel Act Violation)

Scarpa's argument is even weaker for the conspiracy count.  See Mot. 10-12. "Conspiracy is a crime that is separate and distinct from the substantive offense that is the object of the conspiracy." United States v. Rosa, 17 F.3d 1531, 1543 (2d Cir. 1994).  A conspiratorial "agreement is a distinct evil, which may exist and be punished whether or not the substantive crime ensues."  United States v. Jimenez Recio, 537 U.S. 270, 275 (2003).  In other words, "[b]ecause it is the conspiratorial agreement itself that is prohibited, the illegality does not depend on the actual achievement of the coconspirators' goal [and] . . . a defendant may be convicted of the crime of conspiracy even if the substantive offense was not actually committed." Rosa, 17 F.3d at 1543 (also noting that a conspiracy can be committed even if the "essential event did not come to pass" or "because the coconspirators were mistaken in their view of the facts").  "What matters in a conspiracy prosecution is whether the defendants agreed to commit the underlying offense, not whether their conduct would actually have constituted that offense."  Id. See also Jimenez Recio, 537 U.S. at 275 (observing that an "agreement to commit the crime" is the "essence of the conspiracy"); United States v. Umeh, 527 F. App'x 57, 61 (2d Cir. 2013) (rejecting argument that defendant cannot be convicted of conspiring where "defendant believed in something that is objectively untrue").  "[I]n order to prove a defendant

guilty of conspiracy, the government need not show that he knew all of the details of the conspiracy, so long as he knew its general nature and extent." Rosa, 17 F.3d at 1543.

      To infer the formation of a conspiracy, the jury could have drawn on any number of calls in which Gallman discussed his and Scarpa's plans for Cherry.  See United States v. Sanchez Solis, 882 F.2d 693, 696 (2d Cir. 1989) ("For a conspiracy conviction to be affirmed, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." (internal quotation marks omitted)); United States v. Gaviria, 740 F.2d 174, 183 (2d Cir. 1984) (explaining that because "a conspiracy by its very nature is a secretive operation, the existence of and participation in a conspiracy may be established through circumstantial evidence" (internal quotation marks and citation omitted)).

      But one call, GX 10, by itself defeats Scarpa's argument to vacate the conspiracy conviction.  That was when he and Gallman explicitly agreed to have Cherry testify however Scarpa wanted, in return for a "bunch of stuff" he wanted.  And while a single overt act is sufficient, there were a number of overt acts that furthered this conspiracy, including Scarpa's two meetings with Cherry and calling Cherry as his witness.  See ECF No. 74, ¶ 5(h)-(j).  Scarpa's conviction for conspiring to commit a Travel Act violation cannot be set aside.

    C.    The Court Should Not Grant a New Trial

      Scarpa does not advance any distinct arguments under Rule 33.  His motion should be denied for the same reasons that there is sufficient evidence to sustain the verdict under Rule 29.  See, e.g., United States v. Rodriguez, No. 05-CR-630 (SJF), 2007 U.S. Dist. LEXIS 74681, at *9 (E.D.N.Y. Oct. 5, 2007) (denying Rule 33 motion and noting that,

"[d]efendants do not even raise any distinct grounds for their Rule 33 motion beyond that which was presented in support of the Rule 29 motion").

Scarpa is not an "innocent person." Canova, 412 F.3d at 349.   Nor are there "exceptional circumstances" in this case that require the Court to "usurp" the jury's findings regarding the evidence in this case.  Autuori, 212 F.3d at 120.   The only witness whose credibility Scarpa seriously challenged was Biancavilla's, suggesting that he had a personal vendetta against Scarpa that colored his actions and testimony.  Although the Court allowed Scarpa to pursue any lines of cross-examination that sought to uncover bias—which ultimately uncovered nothing—it noted that Biancavilla's conduct was not improper, and did not affect his credibility:

> What evidence do you have, that apart from the fact that he was provided evidence from the Queens DA, that read reasonably would suggest that there was an effort afoot to promise a witness something in return for testimony, that somehow pursuing that in the trial was over-aggressive and biased? Please.

Tr. 322:4-9. Compare with Tr. 29:4-6 (counsel promising the jury it would hear from "an overly aggressive state prosecutor").

Regardless, Scarpa has not identified any testimony—by Biancavilla or any other witness—that he wants this Court to discredit in weighing the evidence.  The Court is therefore left with intercepted communications, a transcript from the Ross trial, and Scarpa's and Gallman's conduct (such as visiting Cherry and putting him on the stand), none of which was disputed.  Scarpa asks repeatedly to dismiss Gallman's words as mere boasting or puffery.  Mot. 5, 9, and 17.  But what Gallman said he, time and time again, did: he said he would visit Cherry, and he did; he said he would try to convince Cherry to testify helpfully for Ross, and both Gallman and Cherry delivered; he said he would help pack the courtroom when Melvin

Anderson was to testify, and he did, Tr. 188:11-189:12.  Scarpa has not pointed to any evidence

as to why the jury should have accepted his argument that Gallman only talked and never

delivered.[9]

Finally, Scarpa attempts to re-litigate the Court's pre-trial rulings allowing Rule

404(b) evidence.[10]  See Mot. 4-6, 10, 14, 18-20.  His renewed arguments cannot serve as a basis

for relief under Rule 33.  See United States v. Castro, 669 F. Supp. 2d 288, 293-94 (E.D.N.Y.

2009) (denying Rule 33 relief, noting that the defendant "seeks to use Rule 33 as a vehicle to

relitigate evidentiary rulings with which he disagrees" but offers "no authority to suggest that

these allegedly erroneous evidentiary rulings would support his request for a new trial"); see also

United States v. Delva, No. 12-CR-802 (KBF), 2015 U.S. Dist. LEXIS 17871, at *12 (S.D.N.Y.

Feb. 13, 2015) (denying defendant's Rule 33 motion because it was merely an attempt to

relitigate evidentiary motions that were briefed and decided before trial); United States v.

Christian, 111 F. Supp. 3d 287, 306 (E.D.N.Y. 2015) (same); United States v. Soto, No. 12-CR-

566 (RPP), 2014 U.S. Dist. LEXIS 60191, at *21 (S.D.N.Y. Apr. 28, 2014) (same).

If anything, Scarpa's arguments at trial confirm the wisdom of the Court's pretrial

rulings.  For example, counsel argued that Gallman was "far from being in sync with John

---

[9] Scarpa decided not to impeach Gallman's credibility under Rule 806, even though the Court overruled the government's objection as to certain communications, because the Court would have allowed the government to introduce Gallman's plea colloquy for purposes of rehabilitation.  During that proceeding, Gallman confirmed that he did in fact meet with Cherry to offer him two benefits that Scarpa has so vigorously argued were never conferred, and then discussed this bribe with Scarpa.  Transcript of December 18, 2018 Hearing, at 7:5-8:14.  At the final pretrial conference, Scarpa's counsel suggested that Gallman's words at the plea hearing should be discounted because he bargained for a lenient sentence, but that is not true.  Gallman was promised no leniency, or even that the government would limit its advocacy to the applicable Guidelines range—which it did not, seeking more than a threefold upward variance.

[10] As set forth herein, the direct evidence of Scarpa's bribery scheme are sufficient to uphold the jury's verdict.  The evidence the Court properly permitted under Federal Rule of Evidence 404(b) relating to the attempts to manipulate the testimony of prosecution witness Melvin Anderson only further supports the jury's findings because it shed light on Scarpa's knowledge and intent.

[Scarpa]," as he stole behind his back, Tr. 34:7-10, that "John didn't always know what Gallman was doing," Tr. 34:15-16, and that the government failed to prove Scarpa's intent, Tr. 649:17-22. Evidence showing that Gallman and Scarpa scripted testimony together during the same trial, shed light on what Scarpa understood Gallman to be saying when he told him that, "Whichever way you wanna play it, [Cherry is] willing."  GX 10T, at 2:15-16.  Gallman's willingness to serve as a false witness for Scarpa and to help him intimidate another witness by packing the courtroom, also disproved Scarpa's argument that the two were not "in sync" during the Ross trial.

For these reasons, this is not the "extraordinary" case requiring the court to exercise authority that is to be used "sparingly" in granting a new trial.  Ferguson, 246 F.3d at 134.

## CONCLUSION

For the reasons set forth above, the defendant's motion for a judgment of acquittal and a new trial should be denied.


Dated:       Brooklyn, New York
             June 13, 2019

                                         Respectfully submitted,

                                         RICHARD P. DONOGHUE
                                         United States Attorney
                                         Eastern District of New York
                                         271 Cadman Plaza East
                                         Brooklyn, New York 11201


                              By:        /s/
                                         Keith D. Edelman
                                         Andrey Spektor
                                         Assistant U.S. Attorneys
                                         (718) 254-6700

cc:  Bruce Connolly, Esq. (by ECF)
     Clerk of the Court (CBA) (by ECF)