MEG:KDE/AS/LKG
F. # 2015R01691

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                     Docket No. <u>18-CR-123 (S-1) (CBA)</u>

JOHN SCARPA, JR.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>


                            RICHARD P. DONOGHUE
                            UNITED STATES ATTORNEY
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201

Andrey Spektor
Lindsay K. Gerdes
Keith D. Edelman
Assistant U.S. Attorneys
    (Of Counsel)

TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................................ 1

II.  BACKGROUND ........................................................................................................... 2

     A.  Crime of Conviction ............................................................................................ 2

     B.  Other Conduct During the *Ross* Trial ................................................................ 7

     C.  Violation of the Terms of Pretrial Release ......................................................... 9

III. APPLICABLE LAW ................................................................................................... 15

IV.  THE GUIDELINES ................................................................................................... 16

V.   ARGUMENT .............................................................................................................. 23

     A.  The Offense Is Serious, Particularly Because It Was Committed By A Criminal Defense
         Attorney ............................................................................................................... 23

     B.  Scarpa's History and Characteristics Require a Significant Sentence ............... 26

     C.  The Need for Deterrence and to Promote Respect for the Law ......................... 33

     D.  The Need to Avoid Unwarranted Sentencing Disparities .................................. 34

         1.  Comparison with Gallman ............................................................................ 34

         2.  Nationwide Comparison ............................................................................... 36

         3.  Need for Substantial Fine ............................................................................. 41

VI.  CONCLUSION .......................................................................................................... 42

## I.    PRELIMINARY STATEMENT

  The defendant John Scarpa, Jr., was convicted by a jury of bribing a witness in a state murder trial.  That conduct alone warrants a sentence within the applicable 30-to-37-month Guidelines range.  But this was no ordinary bribe, and Scarpa is no ordinary defendant; several factors compel an upward variance to promote respect for the law.

  *First*, unlike co-defendant Charles Gallman—for whom the Court significantly varied from the lower Guidelines range, sentencing him to 30 months for the same offense—Scarpa is a criminal defense attorney, who played the lead role in this crime.  Despite his claims of an "unblemished career," Scarpa's Sentencing Submission, Dkt. No. 257 ("Def. Ltr."), at 1, Scarpa has tried to undermine the criminal justice system more than once.  Years ago, a Supreme Court justice in Queens even banned Scarpa from his courtroom for repeatedly lying to him.

  *Second*, Scarpa tampered with a witness while he was on bond, weeks after he was arraigned by this Court.  In a recorded call, he advised a victim of domestic violence to plead the Fifth when she testified against his client.   As a result, Judge Tiscione modified the conditions of Scarpa's release by suspending him from practicing criminal law.

  *Third,* unlike Gallman, Scarpa refuses to accept any responsibility.  Even after Judge Tiscione's finding that Scarpa violated the terms of his release by committing a crime, Scarpa claims he has been fully compliant.  Def. Ltr. at 2.  He also asserts that he has accepted the jury's verdict, but says his "associations" are to blame, id. at 1, and adds that his bribery scheme was never really going to get a two-time killer acquitted, id. at 7.

  *Fourth*, the bribery scheme was not, as this Court remarked when sentencing Gallman, an effort to avoid a traffic ticket; it was a trial strategy developed by Scarpa to free a dangerous murderer through illicit means.  These aggravating factors and others discussed below warrant a sentence of at least 48 months' imprisonment and a significant fine.

II.   BACKGROUND

A.   Crime of Conviction

On May 23, 2019, Scarpa was convicted following a jury trial of violating and conspiring to violate the Travel Act.  See 18 U.S.C. §§ 1952(a)(3)(A), 371; Presentence Investigation Report ("PSR") ¶ 2.  The jury found that Scarpa, along with co-defendant Charles Gallman, bribed Luis Cherry in the 2014-15 bench trial of People v. Reginald Ross, before Suffolk County Supreme Court Justice William Condon.  PSR ¶ 7.

Ross was charged (and ultimately convicted) of the unrelated murders of Raymond Hirt and John Williams.  He retained Scarpa to represent him, and Scarpa relied on the services of his case-fixer, Charles Gallman, to help with the case.  Scarpa thought he needed help with the Williams murder in particular because he believed he could deal with the Hirt murder on appeal.  See GX 18T, at 2:11-19 (Gallman telling Scarpa "[I]t's gonna play out just like you said—he's gonna win one and lose one," and Scarpa observing that, "[I]f I can win the other one appeal, you know . . . [then] we saved him.  And that's what I'm hoping to do"); GX 6T, at 3:31-35 (Gallman relaying this belief to El-Rahim, Ross's uncle, opining that the Williams murder was the tougher one to defend).  The view was not entirely irrational, as there was overwhelming evidence of Ross's involvement in the Williams murder, which he committed with Cherry: prosecutors introduced, among other evidence, testimony of an eyewitness, DNA of Ross's girlfriend on lip balm found at the scene, Cherry's fingerprint on a pack of Newport cigarettes found at the scene, Ross's confessions relayed by someone who knew Ross (Allison Luberda), clear motive (drug debt), as well as evidence recovered from Ross's vehicle that included a firearm, a set of binoculars, narcotics, a ski mask, and plastic ties.  Transcript of the Scarpa Trial ("Tr."), at 91:17-93:6

2

Scarpa devised a plan that he thought would give him the best chance of getting Ross acquitted on the Williams murder.  First, through Gallman, he secured Cherry's agreement to testify favorably for Ross in exchange for the promise of increased prestige in prison and help with his appeal.  Cherry's testimony was to be crafted in a way that navigated around the evidence the prosecution presented at trial.  Second, to maximize the impact of Cherry's anticipated false testimony, Scarpa demanded a bench trial, so that he had a finder of fact who he thought was capable of compartmentalizing Cherry's prior inconsistent statements.

The first part of the plan worked.  In an intercepted call, Gallman called Scarpa and told him that Scarpa is "ok," because Cherry was willing to testify whichever way Scarpa wanted:

| | |
|---|---|
| Gallman: | Just came off the visit.  Boy, listen. |
| Scarpa: | Yeah. |
| Gallman: | I think you ok. |
| Scarpa: | Yeah? |
| Gallman: | Anything we need, he's willing.  Whichever way you wanna play it, he's willing. |
| Scarpa: | Okay. |

* * *

| | |
|---|---|
| Scarpa: | So this guy is willing to do whatever? |
| Gallman: | Whatever you need, John.  Whatever you need. |
| Scarpa: | Ok.  You got it. |
| Gallman: | Whatever you need.  I got a bunch of stuff I wrote down that he wants.  I, cause I don't think—now, it's something about a, a Newport pack. |
| Scarpa: | Right. |

3

| Gallman: | Right.  That his DNA is on. Right? |
|---|---|
| Scarpa: | Yeah? |
| Gallman: | Yeah.  Well, I—well, I—well, I wrote a bunch of stuff down. So, I'll be able to give it to you when I get there. Okay? |
| Scarpa: | Okay. |
| Gallman: | I'm coming in today, so I'll have to see you that—and I'm gonna text you everything. |
| Scarpa: | Okay. |

GX 10T, at 2:7-18, 4:5-24.

By this point, Scarpa had already put in motion the second part of the plan. Before Cherry testified, and when Scarpa still believed Gallman's January 13, 2015 visit to Cherry in prison was secret, Scarpa explained that it was his decision to have a bench trial—a decision Scarpa said he made because of the judge's ability to treat Cherry's prior statements that inculpated Ross (i.e., Cherry's confession and plea to the Williams murder) as only impeachment material, rather than as direct evidence.  See GX 206, at 1867:20-1869:9; Tr. 105:4-15; GX 206, at 1869:20-24 (statement of Scarpa during the Ross trial that he had "deep and long conversation[s]" with his client for "many months" about this strategy).  Before Scarpa called Cherry as a witness at the Ross trial, none of Cherry's prior statements had been admitted into evidence.  Tr. 355:11-356:1.

As Scarpa's witness at the Ross trial, Cherry gave his fourth account about the Williams murder, one that incriminated himself, exculpated Ross, and navigated around evidence introduced at trial.  Tr. 59:5-10; GX 206 (Cherry's testimony at the Ross trial).[1]  Prompted by

---

[1] Cherry testified that he borrowed Ross's red Ford to commit the murder to explain why an eyewitness recalled seeing an out-of-place red Ford Explorer parked on the morning of the murder.  Tr.

4

Scarpa, Cherry even produced a false motive for killing Williams, which did not involve Ross. Tr. 64:21-65:5; Tr. 110:6-111:10 (testimony of Assistant District Attorney ("ADA") Robert Biancavilla that there was no evidence supporting Cherry's purported motive that Scott Williams had shot Cherry's brother). Scarpa knew that Cherry's testimony was not only helpful to the defense but was also entirely inconsistent with Cherry's post-arrest statements and admissions at his plea hearing. Tr. 65:6-66:18. So, Scarpa's detailed direct-examination also allowed Cherry to explain and distance himself from those inconvenient statements. See, e.g., Tr. 111:18-112:8 (in response to Scarpa's question, Cherry stating that he had lied about Ross because he was "mad" at Ross); Tr. 112:20-113:7 (Scarpa asking Cherry to explain his statement to law enforcement about following Ross's directions to exculpate him); Tr. 113:8-114:16 (Scarpa asking Cherry to explain his statements at the plea, during which he incriminated Ross).

The lead prosecutor, ADA Biancavilla, cross-examined Cherry about Gallman's visit to him in jail. Tr. 160:24-162:3. Scarpa was visibly shaken as Biancavilla began this line of cross-examination. Tr. 168:25-169:8. He began to furiously text-message Gallman, asking about the timing of his visit. See GX 23T-27T. When Scarpa finally reached Gallman by telephone, Scarpa exclaimed, "Yeah, you're letting my balls hang out in the wind! I'm fucking texting you, I'm in court, I need to know an answer and, and I got no text back from you!" GX 28T, at 2:12-14. He also demanded to know if Gallman's visit with Cherry was "fucking recorded in any way." Id. at 3:13.

---

62:18-63:7. Ross owned a red Ford Explorer, but Cherry insisted that Ross was not with him. Tr. 63:10-15. As another example, to account for ballistic evidence that showed two guns were used—consistent with Cherry's confession, in which he described Ross as shooting one of the firearms, Tr. 78:4-11; GX 200, at 3—Cherry testified at trial that he had a handgun in each hand, and that he inexplicably kept firing the gun that was jamming. Tr. 64:2-20.

Back in the courtroom, Scarpa went into self-preservation mode.  Having offered Cherry's testimony for its truth, built his strategy for waiving a jury trial in the hopes that Cherry's Ross-exculpating testimony would be credited, Scarpa began telling the judge that, actually, he had always wanted Cherry exposed as a liar.  In summation, he argued that Cherry was full of "stupid haughty inconsistent tales," and that the judge could "tell Luis Cherry was lying because his lips were moving."  Tr. 272:24-273:16; 273:17-21.  See also Tr. 275:2-14. This was the first time during trial that Scarpa argued Cherry should not be believed.  Tr. 355:5-10.  In an apparent attempt to shift the focus away from his own conduct—or perhaps to explain it—Scarpa blamed the prosecution for "purchas[ing] testimony."[2]  Sentencing Ex. A, at 2497:5.[3] After listening to summations, Justice Condon found Ross guilty of both counts.

---

[2] Scarpa argued that:

> The procurement of testimony against Mr. Ross by law enforcement from witnesses called in this case in exchange for special consideration by the district attorney's office is repugnant, and if engaged in by the defense, would certainly be illegal.  While it is not yet the law, which must progress I suggest, with God's grace the disgrace of permitting the use by government to purchase testimony will one day disappear from our legal system . . . .  How then can testimony obtained by promised benefits looking the other way and obviously illegal conduct, et cetera, be relied upon to decide a man's life? . . . . But what did they purchase? And was it really worth the cost?

Sentencing Ex. A, 2496:20-2498:9.

[3] The 2,620-page transcript from the entire Ross trial will be re-submitted on a disk delivered to chambers along with this letter as Sentencing Exhibit A.

B.    Other Conduct During the *Ross* Trial

This Court has also learned that Scarpa's unethical conduct during the <u>Ross</u> trial was not limited to witness bribery; he tried to intimidate a state's witness, Melvin Anderson, and generate false impeachment evidence.[4]

*First*, the defendant and Gallman planned to pack the courtroom with gang members whose presence could unnerve Anderson on the stand.  In one call, for example, Gallman told Ross's uncle, El-Rahim, that if there were "enough people from the hood up there it might change [Anderson's] mind."  GXT 40, 2:24-26.  Scarpa approved this plan.  He agreed with Gallman that seeing those people in the courtroom might cause Anderson to "hold back from being a full-blown snitch."  GXT 37, 5:32-35.  Scarpa knew that Gallman rounded up "15, 16 people" to come intimidate Anderson.  GX 42T, 2:21-22.  He told Gallman, "[W]e'll keep our fingers crossed" that when Anderson sees those menacing individuals he would become, as Gallman put it, a "hostile witness" for the prosecution.  <u>Id.</u> 2:27-31.  Scarpa and Gallman agreed that Anderson was a "piece of shit," which Scarpa told Gallman they knew "from the fact that he's a fucking snitch."  GX 42T, 2:37-40.  Gallman was ecstatic to learn that as many as 20 people were in the courtroom to watch Anderson testify, and instructed El-Rahim to have them throw up gang signs.  GX 44T, 2:16-21; <u>see also</u> Tr. 492:2-4.

Scarpa waited for the intimidation crew to come.  <u>See</u> GX 46T (sending Gallman text message that "No 9ne [sic] here yet.").  When Gallman said that according to El-Rahim, the 20 people were 20 minutes away, Scarpa was pleased: "Excellent."  GX 49T, 51T.  On the day

---

[4] Anderson proffered with the U.S. Attorney's Office for the Eastern District of New York after having been arrested for gun trafficking.  Tr. 184:7-17.  Anderson agreed to testify in exchange for a letter to the government describing his cooperation.  Anderson provided evidence relevant to both the Hirt and the Williams murders.  <u>Id.</u> 184:12-24.

Anderson was scheduled to testify in the Suffolk County courtroom—about 90 minutes away from Queens, Tr. 491:7-10—the court had to provide extra security because of a heavy presence of gang members from Queens, Tr. 188:11-189:6.  Even after Anderson's testimony was rescheduled, Scarpa remained undeterred.  On the day of Anderson's actual testimony, February 3, 2015, see Sentencing Ex. A, 918-19, Scarpa took over the coordination of the intimidation crew—a crew consisting of gang members committed enough to drive back to Riverhead again; Scarpa told Gallman not to worry, that the gang members "are on their way."  GX 54T, 2:13-15.

Second, Scarpa and Gallman planned how to damage Anderson on cross-examination and hide Gallman's affiliation with Scarpa.  Scarpa's attempt to generate bogus impeachment material on Anderson was especially transparent.  In one call, he told Gallman in a hushed tone that he was ready to accuse Anderson of a Queens shooting regardless of whether there was any foundation to believe Anderson had committed it:  "You know—you know, TA?  All I need to know is anybody who's been shot in Queens."  GX 42T, 3:26-27.  Gallman was game:  "Great minds think alike, man."  Id. at 3:29.

Apparently unsatisfied with this line of potential cross-examination, Scarpa also asked Gallman, in an intentionally suggestive and leading way, "Isn't this the guy [i.e., Anderson] that you told me tried to sell Tashiem [i.e., Gallman's son] a gun?"  GX 54T, 2:28.  Gallman knew the answer Scarpa wanted:  "Yes it is!  And if you need me, call me [to testify], buddy."  Id. at 2:34.  Notably, earlier Scarpa and Gallman had discussed that they did not know Anderson at all.  See, e.g., GX 37T, 5:19-20 (Gallman and Scarpa trying to determine what Anderson looks like); GX 34T (Scarpa asking Gallman if "we" ever represented Anderson).  Scarpa then listened as Gallman developed a script, helpfully adding the timing of the made-up

event.  See GX 54T, 6:35-46 (Gallman asking Scarpa when the attempted sale happened, and Scarpa stating that it was "the end of July. Early August").

Scarpa and Gallman also agreed that Gallman could not say he worked for Scarpa. Id. at 3:5-12 (Gallman stating that "of course I can't say I work for you," and "I'm presently unemployed"; Scarpa responding, "Absolutely.").   Realizing that Scarpa's association with Gallman could be discovered, Scarpa suggested a different "eyewitness" to this event: "Wait, wait, wait a second!  What about YKim?  Can't YKim testify?"  Id. at 7:25-26.  But by the time Gallman prepared YKim to serve as the lying witness, it was too late—Anderson had already testified.  See GX 56T, 2:5-11 (Gallman informing Scarpa that he was with YKim, "the man who was going to beat this Melvin Anderson up because he tried to sell the kids guns in the park," and Scarpa responding that Anderson had already testified).

C.    Violation of the Terms of Pretrial Release

Two weeks after he was arrested by the Federal Bureau of Investigation and arraigned on an indictment in federal court, Scarpa was recorded in two calls (both audio files delivered to Chambers and transcribed in relevant part, see Sentencing Ex. B), advising a victim of domestic assault to assert the Fifth Amendment when she testified against the man who had allegedly assaulted her—Scarpa's client.  Scarpa informed her that she was risking criminal exposure if she testified.  Based on this conduct, the government moved to revoke Scarpa's bond, see Dkt. No. 104 (government's motion), and United States Magistrate Judge Steven L. Tiscione, as detailed below, ruled that it was necessary to suspend Scarpa from practicing law to ensure that he stopped tampering with witnesses.

While on pretrial release on this case, Scarpa represented Warnell Wells in two domestic violence cases, one charging a felony (stemming from Wells' use of a firearm), and the other a misdemeanor.  The misdemeanor case was initiated after the victim's daughter called 911

to report Wells' assault of the victim (the "Victim") on June 19, 2016.  The Victim told responding officers that Wells hit her in the face and threw a brick through her window.  A few days later, Wells retaliated against her by posting sexual images and videos of her online.[5]

On October 10, 2018—just five days before trial was set to begin against Wells on the misdemeanor—Wells violated an order of protection against him by calling the Victim from Rikers Island.[6]  Wells then directed the Victim to call Scarpa so he could be added to the conversation.   During this call, Scarpa asked if Wells was using his own inmate PIN to call from prison.  Wells stated that he was, and asked if Scarpa needed him to call back.  Scarpa responded that he would "appreciate it."  Minutes later, Wells called the Victim again, this time from another inmate's account (in violation of the jail's rules), and again told her to include Scarpa.  Scarpa picked up the phone and immediately asked, "We good now?  Alright, so what she doing?"  Scarpa clarified that by "she," he meant the Victim.  Wells responded, "That's who is calling.  She is not cooperating with them."   Referencing previous conversations he had had with the Victim, Scarpa then began advising her on how she should assert the Fifth Amendment when asked questions at trial against Wells:

| | |
|---|---|
| Scarpa: | Ok that—is she on the line with us? |
| Wells: | Yeah. |
| Scarpa: | [The Victim]? |

---

[5] The Victim later recanted her additional allegation that Wells had also choked her and explained that she only reported the choking after the officers told her they could not charge Wells with additional crimes related to the sexually explicit revenge images Wells posted of the Victim.  The Victim maintained that Wells assaulted her on June 19, 2016.

[6] There were two orders of protection in effect in place at the time forbidding Wells from having contact with the Victim: a final order of protection issued on October 30, 2017 that was in effect until October 29, 2018 related to two prior domestic violence cases in which Scarpa represented Wells, and one related to the pending domestic violence case, in which Scarpa also represented Wells.

| Victim: | Yes. |
|---|---|
| Scarpa: | Ok did you talk to that attorney like I told you to? |
| Victim: | I spoke with my attorney, he told me that I don't have a choice but to go in and if there is any question they ask me I have —I can plead the Fifth, but I have to go. |
| Scarpa: | Oh, that's absolutely right. |
| Victim: | Ok. |
| Scarpa: | That's absolutely right, you go. |
| Victim | Mhmm. |
| Scarpa: | [UI] questions, you taking the Fifth. |
| Victim: | Right. |
| Scarpa: | Ok? |
| Victim: | Ok. |
| Scarpa: | That's all you have to do. |
| Victim: | Ok. |
| Scarpa: | Ok, now there are—listen I got to explain it to you a little bit better than that. |
| Victim: | Ok. |
| Scarpa: | You have a right, you have a right to remain silent, if anything that you say could or would be used in a court of law against you that could expose you to a crime.  So now, "what's your name," you can't take the Fifth to, right? |
| Victim: | Uh-huh. |
| Scarpa: | But, did—you know, "Were you involved in an incident with Warnell Wells?" "I take the Fifth." |
| Victim: | Uh-huh. |

| | |
|---|---|
| Scarpa: | You understand what I'm saying?  You can take the Fifth to anything that has to do between you and Tootie [Wells]. |
| Victim: | Ok. |
| Scarpa: | Anything, anything at all that you know, "Was he your boyfriend?"  "I take the Fifth." |
| Victim: | Ok. |
| Scarpa: | You don't have, you don't have to answer any of those questions because, you know, they are gonna try to claim that this was the person that you were claiming, you know, did something to you, and if you are saying now that that's not true that it didn't happen then they are going to try to pin something on you. |
| Victim: | Right. |
| Scarpa: | So you have an absolute right to remain silent. |
| Victim: | Ok. |
| Scarpa: | Ok? |
| Victim: | Yes. |
| Scarpa: | So, I don't—now—did you—you didn't tell them that you were going to do that, did you? |
| Victim: | No, no, no, nah-uh. |
| Scarpa: | Of course, alright—so the fools—let, let them play the game now. Ok? |
| Victim: | Ok. |
| Scarpa: | Alright. |

Wells' trial on the misdeamonor case began five days later, on October 15, 2018.

Scarpa requested that the Victim stay in the courtroom because, he told the judge, his client had

the right to have his significant other support him.  See Sentencing Ex. E, at 22:14-23:4.

Moments later, in his opening statement—as the Victim watched—Scarpa promised that she

12

would be exposed as a liar, see id. at 31:10-32:12, though, he claimed, he was not "looking

forward to having to ask [the Victim]" certain questions on cross-examination, id. at 33:17-22.[7]

He added that he was not sure how the state was going to prove a June 19, 2016 assault involving

the Victim.  Id. at 33:8-15.  After his opening statement, Scarpa was seen speaking with the

Victim in the courthouse.  Following that conversation, the Victim approached the assigned

ADAs and told them that she no longer remembered the June 19 assault.  The next day, on

October 16, 2018, the Victim told the ADAs that she now remembered the June 19 assault, and

that she was actually the one who assaulted Wells.  On October 17, 2018, before testimony

began in the trial, the ADAs discovered the two jail calls quoted above (and enclosed with this

submission) and petitioned the court to remove Scarpa from the case.  Soon thereafter, Scarpa

preemptively withdrew from the case.[8]

         This Court referred the government's motion to revoke bail to Judge Tiscione.

Through his attorneys, Scarpa argued that his conduct was "neither criminal nor unethical."  Dkt.

No. 108, at 7.  He asserted that he acted as an "officer of the court," by advising the Victim that

she needed to retain independent counsel.  Id.  Scarpa's counsel maintained this position at the

revocation hearing, claiming Scarpa was simply seeking to "determine whether or not [the

Victim] understood [her Fifth Amendment rights] and whether or not the case was going to go

---

[7] Before opening statements, the ADA notified the presiding judge that the Victim was in the courtroom.  The judge asked the Victim to wait outside but Scarpa interjected, asking that the Victim remain.  The ADA—who at the time was not yet aware of the call between Wells, Scarpa, and the Victim—did not object, and the judge allowed the Victim to remain.  See Sentencing Ex. E, 22:14-23:4.

[8] Wells has since pleaded guilty in the misdemeanor case, and the felony case remains pending, with a different attorney assigned.  Transcripts from the state proceeding are enclosed on the disk as Sentencing Exhibits E and F.  They are not separately docketed because they contain the Vicitm's name.

forward, whether she was going to plead the Fifth or no." Transcript from November 26, 2018 Bail Revocation Hearing ("Bail Revocation Tr."), at 13:15-17.

Judge Tiscione was outraged by Scarpa counsel's suggestion that this was business-as-usual for any defense attorney: "[Do] you think defense attorneys make a habit of calling the victims in case of domestic violence and counseling them to take the Fifth Amendment and that's okay?" Id. at 11:24:12:2. The Judge also highlighted Scarpa's implicit threat in the conversation to dissuade the Victim from testifying by suggesting to her, "that if she doesn't take the Fifth Amendment the prosecution is going to come after her." Id. 14:2-5. Judge Tiscione continued:

> Your client was conflicted from the very beginning. It was his client's interests that were at stake and he had no business talking to the victim. None. None whatsoever, especially about the Fifth Amendment and her rights thereto. . . . Not to mention the fact that your client knew that his client was on the phone and set up this whole thing in violation of a protective order. And not only did he not hang up the phone, which is what he should have done, he continued with the conversation thereby continuing the violation of the court order, encouraging the violation of the court order. And put aside the fact that the first call makes clear -- or the very beginning of that call when he asked his client what she was doing, makes it clear that he knew his client was communicating with the victim in violation of the court order. He then communicated with her himself with his client on the line, clearly aiding and abetting his client's violation of the protective order.

Id. at 14:20-15:13. See also id. at 19:2-7 (Judge Tiscione noting that Scarpa took it upon himself to "explain to [the Victim] how she can assert the Fifth Amendment in a way that would protect her interests and his client's interests and also putting in an implicit threat to the complainant that if she doesn't assert the Fifth Amendment the Government is going to come after her").

As a result of Scarpa's conduct, Judge Tiscione made it a condition of Scarpa's bail that he not practice criminal law or any type of law that put him in contact with witnesses,

because Scarpa presented an ongoing danger that he would "tamper with witnesses in other cases." Id. at 32:25-33:1; 48:25-49:7.  The court explained that, at the very least, Scarpa committed, a "gross ethical violation," id. at 31:22, and likely at least one crime, id. 37:21-25 (finding probable cause to believe that Scarpa aided and abetted the violation of a protective order); id. 38:4-6 ("suspect[ing]" but not deciding that Scarpa also committed witness tampering); id. at 34:18 (finding, at least, "borderline witness tampering").

III.    APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted); see also United States v. Booker, 125 S. Ct. 738, 743 (2005) (although the Guidelines are advisory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence).

Next, courts should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented." Gall, 552 U.S. at 50 (citation and footnote omitted).  Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [18 U.S.C. § 3553(a)(2)]."  The factors courts shall consider in imposing sentence include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as the need for the sentence imposed:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

15

(C)     to protect the public from further crimes of the defendant;
        and

(D)     to provide the defendant with needed educational or
        vocational training, medical care, or other correctional
        treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In addition, 18 U.S.C. § 3661 provides that, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

## IV.     THE GUIDELINES

The government objected to the Guidelines calculated by Probation, set forth in PSR ¶ 18.  See Dkt. No. 250.  The government submits that the appropriate Guidelines range is 30 to 37 months' imprisonment, based on the following calculation:

|  | | |
|---|---|---|
| Base Offense Level:<br>(§§ 2X1.1(a), 2E1.2(a)(2), 2C1.1(a)(2), 2C1.1(c)(2), 2J1.2(a)) | | 14 |
| Plus: | Substantial Interference With Administration of Justice<br>(§ 2J1.2(b)(2)) | +3 |
| Plus: | Aggravating Role: Use of Special Skill (§ 3B1.3) | +2 |
| Total: | | 19 |

The difference in the government's calculation from the calculation offered in the PSR stems from U.S.S.G. § 2C1.1(c)(2), which provides in relevant that, "If the offense was committed for the purpose of concealing, or obstructing justice in respect to, another criminal offense, apply . . . § 2J1.2" if the resulting offense level is higher.

The cross-reference applies because Scarpa committed the bribery offense for the purpose of obstructing justice in the prosecution of the Williams murder in the Ross trial.  The

16

resulting offense level is higher:  instead of an offense level of 12 under § 2C1.1(a)(2), the base offense level of § 2J1.2 is 14.

In addition, a three-point enhancement applies under 2J1.2(b)(2) because "the offense resulted in substantial interference with the administration of justice."  Application notes explain that such interference "includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*."  U.S.S.G. § 2J1.2, comment. (n.1) (emphasis added).[9]

Here, both the state authorities and the court system wasted substantial resources as a result of Scarpa's conduct.  Scarpa's entire trial strategy, by his own account, revolved around Cherry's testimony—which was revealed to be false and procured through a bribe.  Because Scarpa offered Cherry's perjurious testimony at trial:

---

[9] The government overlooked this cross-reference in advance of Gallman's sentencing and thus did not object to the lower Guidelines calculation set forth in Gallman's PSR.  Without objections from either party, the Court applied the base offense level proscribed by Section 2C1.1(a)(2), resulting in a final Guidelines range of 12 to 18 months, which included Gallman's conviction for conspiring to commit the "RDAP" false statement offense and reduction for acceptance of responsibility.  See February 28, 2019 Transcript of Gallman's First Sentencing Hearing, 3:19-4:19.  The Court sentenced Gallman to 30 months for the bribery offense alone, concluding that a Guidelines sentence would not have promoted respect for the law.  See March 7, 2019 Transcript of Gallman's Second Sentencing Hearing, 7:9-9:9.  Because Scarpa was the one who called Cherry as a witness and was therefore the person most responsible for the substantial waste of government and court resources, the cross-referenced provision and enhancement, while likely applicable to both defendants, is more clearly appropriate for Scarpa.  In any event, any error in the Guidelines calculation (caused by the government) that benefited Gallman is no reason to commit the same error when sentencing Scarpa.  See, e.g., United States v. McNair, 605 F.3d 1152, 1232 (11th Cir. 2010) (rejecting the argument that just because the "district court made a mistake in calculating the co-defendant's guidelines sentence, [the defendant] should benefit from the same miscalculation"); United States v. Morones, 530 F. App'x 685, 690 (10th Cir. 2013) (holding that a mistake in a co-defendant's sentence does not "make another defendant's sentence [based on a correctly calculated Guidelines range] unreasonable in any way"); see also United States v. Rodriguez, 648 F. App'x 9, 12 (2d Cir. 2016) (noting that the focus of § 3553(a)(6) is avoiding nationwide disparities in sentencing, not necessarily those between co-defendants).

(1) the prosecution team scrambled to investigate Gallman and his visit to Cherry, by among other things, listening to wiretap calls and obtaining jail records, all in the middle of a lengthy, 50-witness trial, Tr. 161:7-13;

(2) the Queens County District Attorney's Office had to decide whether to share the details of the otherwise-secret investigation with the Suffolk County prosecutors, and then deliver the wiretap, Tr. 473:10-474:1;

(3) the state's resources were spent twice transporting Cherry for court in Riverhead to/from the Downstate Correctional Facility in Fishkill, New York, an approximate three-hour roundtrip, see GX 301, 401;

(4) judicial resources were further wasted having to rule on issues related solely to, or arising from, Cherry's testimony—including, for example, Scarpa's motion to disqualify the lead ADA from the case, Sentencing Ex. A, 2230:15-24—as well as receiving Cherry's perjurious testimony over the course of four days (on February 24, 2015, continuing on February 26, March 2, and March 3), and having to consider this false testimony in the court's fact-finding role; and

(5) the prosecution in the Ross trial had to call two rebuttal witnesses, detectives Peter Gallaso and John McLeer, to rebut the allegations made by Cherry.  Sentencing Ex. A, 2448:21-2464:24.

For his part, Cherry—enabled by Scarpa—made a mockery of the proceeding, hijacking parts of a double-homicide trial, all while the victims' families watched in attendance.[10]  See, e.g., Tr. 159:17-21, 290:1-3 (highlighting how Cherry made derogatory

---

[10] See, e.g., Thorne, Kristin, Families Emotional as Long Island Murder Trial Gets Underway, available at, https://abc7ny.com/440159/.

comments regarding the lead ADA's wife after Cherry tried to spit at him); Tr. 160:2-6 (noting that the presiding judge stated the court was "taking judicial notice of the witness's comments, his colloquy, and how he has conducted himself").

The combination of wasted government and judicial resources fits squarely within the wide range of conduct that courts—including this Court—have held amount to "substantial interference with the administration of justice" under § 2J1.2(b)(2). See, e.g., United States v. Leung, 360 F.3d 62, 67 (2d Cir. 2004) (same, where a defendant had been charged with bail jumping, finding "some overlap" between the charge and the enhancement, but nevertheless affirming the enhancement because "numerous Marshals had to spend significant time consulting with the Law Department, the Missing Persons Unit, and Cantor Fitzgerald as well as conducting interviews with family members, former employers, and others"); United States v. Amer, 110 F.3d 873, 885 (2d Cir. 1997) (affirming this Court's application of the enhancement, where defendant was charged with removing his children to Egypt even though there was no ongoing proceeding because his act "prevented proper legal proceedings"); United States v. DeSalvo, 26 F.3d 1216, 1218, 1223-24 (2d Cir. 1994) (affirming imposition of the enhancement on an attorney whose firm's lawyers had been charged with bribing witnesses and manufacturing evidence, finding that his own lies about knowledge of this activity led to his charges, holding that if he had been truthful it "would have saved the government substantial investigative and trial expenses"); United States v. Spaulding, 631 F. App'x 5, 12-13 (2d Cir. 2015) ("[F]alse arrests and his false police reports of those arrests caused unnecessary expenditure of governmental resources and interfered with the state criminal justice system by requiring those courts to make judicial determination[s] based upon false evidence."); United States v. Gray, 692 F.3d 514, 522-23 (6th Cir. 2012) (same, where falsification of documents made an investigation

"more difficult" and delayed a trial); United States v. Voss, 82 F.3d 1521, 1533 (10th Cir. 1996) (same where failure to respond to subpoenas resulted in hearing and orders directing defendant to comply); United States v. Mallory, 525 F. Supp. 2d 1316, 1320 (S.D. Fla. 2007) (same, where the government spent resources transporting defendant for re-sentencing); see also United States v. Atl. States Cast Iron Pipe Co., 627 F. Supp. 2d 180, 203-04 (D.N.J. 2009) (collecting authority).

As the Second Circuit has observed, there is no requirement of "particulariz[ing] a specific number of hours expended by government employees"; the district court need only make a specific finding of the wasted resources.  DeSalvo, 26 F.3d at 1224.  Here, all three of the types of resources were wasted—prosecutorial, investigative and judicial—during a high-stakes judicial proceeding.

The Circuit has also held that where a defendant is the "only known source of information, substantial interference with the administration of justice may be inferred."  Id. (internal quotation marks omitted).  Scarpa had two meetings with Cherry at the Suffolk County jail, during which the ADAs strongly suspected—though they could not know with certainty as the meetings were not recorded—Scarpa scripted Cherry's testimony.  See GX 303; Tr. 648:1-10 (defense arguing that Scarpa could not have scripted the testimony in those meetings).  The only people who knew the subject of the meetings were Cherry and Scarpa.  Cherry felt free to lie on the stand, knowing that the only person in the courtroom who could expose him was his enabler, Scarpa, who would protect Cherry as he listened to the perjurious testimony.  See, e.g., Tr. 179:4-15 (Cherry claiming he and Gallman only discussed "bitches" and the "law library," which Scarpa knew was not true as Gallman called Scarpa after the visit and told Scarpa that Cherry talked about the evidence in the Ross case).

Scarpa's arguments to the contrary are unavailing.  He suggests that his scheme to elicit false testimony in the <u>Ross</u> trial through bribery was simply his "ill-conceived" way of fulfilling a "duty to zealously represent his client, however reprehensible that client was." Def. Ltr. 4-5.  His conduct, Scarpa maintains, was an effort to "create doubt as to who actually committed that murder."  Def. Ltr. 5.

There are two problems with his position.  *First*, it ignores the jury's verdict; the notion that Scarpa was simply doing his job as a zealous advocate in the <u>Ross</u> case was made to, and rejected by, the <u>Scarpa</u> jury.  *Second*, there is no safe harbor for conduct at a trial. Attempting to generate reasonable doubt gives neither lawyers nor their clients license to obstruct justice by calling a witness to commit perjury, let alone bribing that witness to do so. <u>See, e.g.</u>, <u>United States v. Livoti</u>, 196 F.3d 322, 327 (2d Cir. 1999) (holding that the district correctly applied an obstruction-of-justice enhancement because the defendant, a former police officer, "had called fellow officers as trial witnesses knowing that they would lie").[11]

Scarpa's response to the substantial-interference enhancement is more of the same—more trivialization of the crime and minimization of his own role in committing it.  He argues that Cherry would have testified anyway, regardless of whether Scarpa bribed him, because "Ross and Cherry had begun colluding," even before Scarpa was involved.  Def. Ltr. 5. Scarpa purports to analyze some of the cases cited above and offers a false comparison:  he

_____

[11] <u>See also</u> <u>United States v. Miller</u>, 159 F.3d 1106, 1112-13 (7th Cir. 1998) (same, for suborning perjury by calling sole witness to contradict testimony of government witnesses); <u>United States v. Calderon-Avila</u>, 322 F.3d 505, 507 (8th Cir. 2003) (same for "obsuct[ing] the government in its prosecution efforts," observing that, "While it is true an obstruction enhancement cannot apply to a defendant's election to mount a defense and exercise a constitutional right . . . Defendant does not have a constitutional right to commit or promote perjury." (internal citation omitted)); <u>United States v. Bradberry</u>, 466 F.3d 1249 (11th Cir. 2006) (same, noting the enhancement is appropriate when a defendant aids, abets, or induces perjury by calling a witness to give perjured testimony).

asserts that none of the conduct summarized in those opinions is anything like "calling a witness in a murder trial," or a "criminal attorney defending a murder case"; Scarpa even claims that not calling Cherry "could have undermined his client's rights to compulsory process."  Def. Ltr. 5.

This misses  the point.  The enhancement is warranted not because Scarpa called a witness at trial, but because he bribed one to commit perjury and in the course of that criminal conduct wasted substantial judicial, prosecutorial, and investigative resources.  Scarpa offers no reason why those resources are any less substantial than, for example, U.S. Marshals' efforts to arrest a defendant who had jumped bail, Leung, 360 F.3d at 67, [12] or time spent reviewing false police reports, Spaulding, 631 F. App'x at 12-13.  Scarpa did not, as he points out, cause the Williams murder, Def. Ltr. 5, but there is no evidence that Cherry would have testified falsely for Ross regardless of who was Ross's defense counsel.  None of the letters Ross had written Cherry suggested that Cherry testify in the Ross trial.  As recounted above, Scarpa's trial strategy centered around Cherry's false testimony, which Gallman reassured after his visit with Cherry was still in tact ("I think you ok").  And it was after meetings with Scarpa that Cherry's narrative was shaped around the evidence adduced at the Ross trial.

Accordingly, Scarpa's conduct related to the bribery scheme substantially interfered with the administration of justice.  The appropriate range is therefore 30 to 37 months.

---

[12] For partly this reason Scarpa is also wrong that his conviction accounts for the enhancement, Def. Ltr. 6: as Leung, 360 F.3d at 67, makes clear, some overlap with the conviction does not invalide the enhancement.  In any event, Scarpa could have committed the bribery offense without wasting substantial resources.  He could have, for example, approached an already-testifying witness and swayed him to change his testimony or persuaded him not to testify at all.  Those actions would still constitute a crime but the enhancement would not be warranted.

V.     ARGUMENT

Scarpa was sworn to uphold the law but he tried to subvert it by undermining a criminal trial and attempting to free a dangerous killer.  This was not an isolated incident, but just an example of the grossly unethical conduct in which Scarpa routinely engaged, even after he was arrested on federal charges.  A sentence of 48 months is therefore necessary to reflect the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), "the history and characteristics of the defendant," id., "to reflect the seriousness of the offense," 18 U.S.C. § 3553(a)(2)(A), "to promote respect for the law," id., "to provide just punishment of the offense," id., and to guard against "unwarranted sentence disparities," 18 U.S.C. § 3553(a)(6).

A.     The Offense Is Serious, Particularly Because It Was Committed By A Criminal Defense Attorney

Even before Scarpa's trial, the Court recognized the gravity of the bribery offense when imposing a sentence on Gallman.  It explained that the crime was "far more serious" than the RDAP-false-statements offense of which Gallman had also been convicted, as it involved "bribing a witness to lie in a criminal case in an effort to have a very dangerous murderer go free."  March 7, 2019 Transcript of Gallman's Second Sentencing Hearing ("Gallman Tr."), 6:9-11; see also February 28, 2019 Transcript of Gallman's First Sentencing Hearing, 47:19-22 (the Court drawing a contrast between "brib[ing] a witness in an automobile accident case to say somebody took a left turn" and "brib[ing] someone in a case with an effort towards getting a murderer off").  Ross killed two people—two cold-blooded executions; one man was on his way to work and the other was at a jobsite.  The senseless murders left one family without a father

23

and both families questioning why Ross chose these innocent people as his targets.[13]  That's the person Scarpa and Gallman were hoping to free—through criminal means.

For the same offense, though a lesser role (as explained below), the Court believed that a significant variance from the 12-to-18-month Guidelines range was necessary in sentencing Gallman, imposing a 30-month sentence for the bribery-conspiracy count alone (to run consecutive to the six-month sentence for the RDAP-fraud conspiracy).  Gallman Tr. 8:20-9:2; see also id. 6:9-11 (describing the bribery as the "far more serious offense").[14]

Just as disturbing, Scarpa is an attorney, and, worse, a former prosecutor.  This Court noted Scott Brettschneider's occupation when comparing his culpability to that of his co-conspirators in the RDAP fraud, noting that "none of the defendants [including Gallman] were attorneys."  July 26, 2019 Sentencing Transcript of Scott Brettschneider ("Brettschneider Tr."), 30:8-10.  This factor goes beyond the enhancement reflected in Scarpa's elevated Guidelines range based on the use of his special skill.  Like Brettschneider—convicted of a much less serious offense—Scarpa was, as this Court put it, "a lawyer sworn to uphold the law, not to subvert it."  Id. 26:22-23.  "Judges . . . rely on counsel to provide them truthful information when having to make difficult decisions."  Id. 26:23-24.

---

[13] See, e.g., Smith, Andrew, Reginald Ross Sentenced to the Maximum Penalty of 74 Years in Death of Two Men, *available at* https://www.newsday.com/long-island/suffolk/reginald-ross-sentenced-to-the-maximum-penalty-of-74-years-for-killing-two-men-1.10327612 (collecting quotes from victims' families and Scarpa).

[14] Gallman's three co-defendants received probationary terms, though Scott Brettschneider's terms of probation also included, among other things, a 60-day period of confinement in a community center.

Judge Vitaliano echoed this observation when sentencing a criminal defense attorney who helped manipulate subpoenaed documents.  An attorney who breaches the trust placed in him by our judicial system erodes the very foundation on which our system rests:

> [I]t becomes a very serious breach of a sacred duty that lawyers take on, that lawyers . . . raise their right hand and step forward . . . . [O]ther than putting on a uniform and defending your country in the time of war, there is no greater act of patriotism and citizenship than to put aside your own work and sit in that jury box and make the justice system work, because we are a rule of law sort of people. And when hundreds of thousands of Americans have -- today, we celebrate Flag Day -- when hundreds of thousands of Americans are killed in the line of duty, and they put that flag over their casket, they are there defending the rule of law in a time of war. And then that rule of law is handed off when those wars end. They are handed off to a court system that consists, yes, of jurors and judges, but what makes it function are the lawyers, the people who raise their right hand and swear that they are going to make that rule of law to vindicate the blood that was shed to make the system work. . . . [H]ow do I impose . . . . punishment on the guy who let down the people who died for the rule of law? How do I satisfy that obligation . . . ?

Sentencing Ex. C, June 14, 2019 Transcript of Sentencing of John Servider, 21:12-23:4.   In sentencing Servider to 18 months' imprisonment, Judge Vitaliano explained that altering documents requested by a grand jury, when committed by "a lawyer . . .  [is] a very serious crime." Id. 22:17-20.

Scarpa's breach of trust is of significantly greater magnitude than Servider's. Scarpa did not alter documents in an attempt to mislead an investigation of potential unreported income; he bribed a witness to perjure himself in a double-homicide trial.  Nor was Scarpa, by any stretch, a minor player compared to his co-defendant, the way Judge Vitaliano described Servider's role vis-à-vis his co-conspirator.  See Sentencing Ex. C, 20:12-13.  Scarpa framed the trial strategy around Cherry's anticipated false testimony, and, through his questioning, navigated the testimony around damning evidence introduced against his client.  As discussed in

25

this memorandum, Scarpa also engaged in other unethical misconduct during the trial.  Even when arrested on federal charges, he committed at least one state crime when he engaged in conduct that a federal judge called at least "borderline witness tampering."  It is difficult to imagine a more egregious breach of trust by an officer of the court, and therefore the seriousness of the offense counsels heavily in favor of an upward variance.

B.      Scarpa's History and Characteristics Require a Significant Sentence

Scarpa touts his "unblemished disciplinary record," Def. Ltr. at 1, and his service as a prosecutor, id. at 1, 2.  But bribing Cherry was not an aberrational event—Scarpa has repeatedly crossed the ethical line and tried to undermine the criminal justice system.  Nor was Scarpa, as this Court remarked about Brettschneider's RDAP fraud, "pulled into something simply out of a desire to help someone."  Brettschneider Tr., 28:17-19.  Ross was just another client for Scarpa, one whose representation he took over from another attorney to act as trial counsel.  Tr. 261:11-17.

There are at least four reasons that Scarpa's claim of an "unblemished" record should carry as little weight as his assertion that he has complied with all the terms of supervised release.  See Def. Ltr. 2.  *First,* two weeks after he was arraigned by this Court, Scarpa continued to commit, as Judge Tiscione found, "gross ethical violation[s]," likely at least one state crime, and "borderline witness tampering."  Bail Revocation Tr. 31:22, 37:21-25, 38:4-6, 34:18.  As the Court can hear in the calls, two weeks removed from appearing before this Court on his own federal indictment, Scarpa tried to silence a victim of domestic violence by invoking fear that she may expose herself to criminal charges by testifying.  He did it while his client, who was precluded by two protective orders from having contact with the Victim, listened.  After laying the groundwork in the jail calls, in the courtroom Scarpa demanded that the Victim stay to hear his opening address, in which he promised to expose her as a liar.  Scarpa's conduct—all while

on bond in this case—was so egregious that Judge Tiscione felt compelled to suspend Scarpa's

law practice because it made him a danger to the community.

*Second*, even during the <u>Ross</u> trial, bribing Cherry was not the full extent of

Scarpa's misconduct.  Scarpa prepared Gallman to lie about impeachment information relating to

state's witness Melvin Anderson, feeding Gallman the timing of a supposed gun sale.  He also

prepared Gallman to lie about working for him, and then suggested that Gallman get a different

"eyewitness" for the made-up event.

To damage the same witness's direct examination, Scarpa encouraged Gallman to

pack the courtroom with gang members from Queens.  When Gallman committed to having

"three car loads of people," Scarpa told him, "good job." GX 43T, 3:41-4:7.  The trial schedule

made the efforts more challenging—the intimidation crew came but Anderson's testimony was

rescheduled.  But Scarpa was undeterred; he personally coordinated with those gang members,

telling Gallman they were on their way, as Anderson was preparing to take the stand.  GX 54T,

2:13-15.  On cross-examination, Scarpa reminded Anderson that as a Crips gang member, his

testimony put a target on his back, asking him if "it's especially bad for a snitch to be a Crip and

to snitch on another Crip . . . ?" Sentencing Ex. A, 978:16-18.  To drive home the threat, Scarpa

began his cross-examination by asking Anderson to study the courtroom audience so that

Anderson could see the intimidation crew that Scarpa helped to bring:

| | |
|---|---|
| Scarpa: | Where you're sitting, can you see the audience? |
| Anderson: | Yes. |
| Scarpa: | Do you recognize anybody? |
| Anderson: | Few people. |
| Scarpa: | Who? Who do you recognize in the audience? Tell the judge. |

27

| | |
|---|---|
| Prosecutor: | Objection. |
| The Court: | I'll allow it. |
| Anderson: | His family. |
| Scarpa: | Whose family? |
| Anderson: | LT's [i.e., Ross's] family. |
| Scarpa: | Where do you recognize them from? |
| Anderson: | Queens. |
| Scarpa: | From Merrick west side? |
| Anderson: | West Side Merrick. |
| Scarpa: | West Side Merrick? |
| Anderson: | Yeah. |
| Scarpa: | That's where you hang out, west side Merrick, right? |
| Anderson: | Yes. |

Sentencing Ex. A, 957:17-958:13.  West Side Merrick (or "WSM") is a particular crew operating in the area, which Scarpa undoubtedly knew as he repeated the question.  The rest of the cross-examination had nothing to do with members of the audience or Ross family's geographical proximity to where Anderson lived.  It was a clear threat that—without the benefit of hearing the Anderson-related wiretap calls—neither the prosecutor nor presiding judge could appreciate.

As the Court is aware from pre-trial litigation, after Scarpa was finished with his primary witness, Cherry, Scarpa also called May Frances Ross as an alibi witness.  May Ross gave a facially incredible account of remembering Ross enter her house, just as she was resting "naked on the couch" in her single-story house that she shared with three sons.  Sentencing Ex.

28

A, 2321:8-2323:21.  May Ross also lied about (1) the day she first met Ross (he was incarcerated

on that date); and (2) that she had attended law school at both Stetson University in Florida and

St. John's University.  She studied at neither, and yet in response to Scarpa's question, recalled

having a 3.897 GPA.  See Dkt. No. 186, at 8.[15]

    Unlike with Cherry and the planned false impeachment against Anderson, it

appears, based on wiretap calls, Scarpa was not the source of May Ross's lies and was, perhaps,

closer to being willfully blind than fully aware of them.  But even those discussions with

Gallman were telling:  Scarpa's witnesses were there to testify how he wanted, not to tell the

truth.  Anything short of that annoyed Scarpa.  In a March 5, 2015 call, for example, he

expressed frustration to Gallman that May Ross did not stick to their script.  Scarpa recounted to

Gallman that instead of saying what she had been "prepped to say, she says, 'Oh I kept a you

know, a log of ah of all, you know anybody I owed money to, so I wrote it down in a book.'"

Gallman asked, "Why didn't she say what you told her to?"  Scarpa replied, "The fuck do I

know."

---

[15] Cherry was Scarpa's first witness.  He then called Ross's wife and co-conspirator in the Cherry bribery scheme, Crystal Cincotta.  See Dkt. No. 203, at 9 (explaining that Cincotta was a co-conspirator). Notably, Cincotta was represented by Scarpa's son.  Cincotta testified she helped Ross breed dogs for a living, omitting the fact that Ross apparently fed small dogs (or puppies) to the alligator-like creatures he also kept, and that Ross made his money dealing drugs.  Sentencing Ex. A, 1551:5-1552:6 (description of the animal carcass and alligators discovered in Ross's basement); 2244:12-25 (Cincotta's testimony). Scarpa called her as a witness primarily to explain away some of the damning evidence found in Ross's car, including, for example, binoculars that Scarpa suggested could have been used by Cincotta, duct tape that Cincotta claimed to use for her job, and gloves she purported to use for hair-coloring.  See id. at 2262:4-10 (Scarpa asking, "Did you ever use the binoculars for, say, for the purpose of looking at the dogs while they ran on the beach?"); id. at 2263:18-20 ("When I go to people's houses to color their hair I put plastic down and duct tape so I don't get color on the floor of their house, so."); id. at 2264:10-20 (explaining her purported daily use of gloves).  On cross-examination, Cincotta claimed ignorance of Ross's drug-dealing, despite her statements to the contrary to the police.  Id. at 2281:10-2282:13. Scarpa's third witness was May Ross; he ended the defense case with Quine Jackson, who testified about the purported mental instability of Allison Luberda, one of the government's key witnesses.

*Third,* Scarpa employed Gallman, whom the Court has already described as a professional case "fixer," Brettschneider Tr. 27:21-22—a pseudo-paralegal/investigator who worked with a small and self-selected group of deeply unethical lawyers to sabotage criminal cases and bring civil lawsuits based on false recantations.  Examples of the kind of conduct in which these attorneys have engaged abound.  See Dkt. No. 23, at 6-12; Dkt. No. 147, at 11-13, 153.  Two of those lawyers (Scarpa and another attorney) have been convicted of bribery.  A third lawyer used Gallman to try to intimidate a witness and showed complete disrespect for the presiding judge.[16]  The fourth, Brettschneider, was convicted of lying to a federal agency, and, as this Court found, worked with Gallman in selling a recantation that (whether or not Brettschneider knew it) was certainly false.  Brettschneider Tr. 28:23-30:2.

But no one—not even Brettschneider—worked as closely with Gallman as Scarpa.  Scarpa effectively employed Gallman, giving him space in the office, and exchanged over 350 calls during the six-month wiretap period alone.  Tr. 436:11-20; 437:10-13. Gallman and Scarpa even referred to each other as brothers.  See, e.g., GX 3T (Gallman telling Scarpa, "Just want[e]d to say thank you for being my brother and I love you more th[a]n I could ever say[.]"); GX 4T, at 13:14 (Gallman rhetorically asking Scarpa, "[H]ow is it possible that I can be

---

[16] As the government described in previous submissions, that lawyer sent Gallman to intercept a victim of a knifepoint robbery on the way to a lineup, but when the victim did not show up, and the presiding judge set $150,000 bail in the violent case, the lawyer remarked about the judge, "Oh, you one of those bitches? . . . [D]evil ass bitch."  She told Gallman that "when there's a race war, I'm taking this bitch's head off personally. I can't wait." The two resolved not to waive time to indict because, as the lawyer said, "You ain't got him [the victim] now, you ain't going to have by Monday."  Gallman then worked with the defendant's father to try to find and bribe the victim not to cooperate.  See Dkt. No. 23, at 9-10.  When Gallman interacted with lawyers outside of this small group, the conversations were revealing.  In one call the government offered the Court at Gallman's sentencing, a lawyer was confused about Gallman's role because Gallman admitted he was not an investigator.  Gallman explained, that "I'm known in the street for helping guys get out of jail.  Helping guys . . . For helping guys get out and guys who don't want to go to jail.  I help them."

mad at my brother?").  In Scarpa's law practice, Gallman was effectively an equity partner, albeit

one with an unusual skillset and job description.  See, e.g., GX 28T, 6:43-7:2 (Gallman

complaining to Scarpa that the Ross trial was hurting their business, "We ain't making no

money, John.  The phone ain't even ringing," and Scarpa reassuring Gallman that he will be

back, and "you know we got some stuff"). [17]

So even more than Brettschneider, Scarpa "chose as a close associate the

thoroughly disreputable Charles Gallman whose value to the defendant, in addition to whatever

administrative task he may have performed, was to bring business in from the criminal world in

which he was a fixer."  Brettschneider Tr. 27:18-22 (Court's observation).  Scarpa knew "exactly

who Charles Gallman was and how he operated.  Tr. 28:2-3 (same); see also Tr. 29:12-13

(Court noting that "[o]ne of the things Gallman trades in was false recantations").  And Scarpa

not only tolerated Gallman, but, as the Cherry bribery scheme and other misconduct during the

Ross trial show, relied on him.

*Fourth*, and directly contrary to his sentencing submission, Scarpa has long held a

reputation as a dishonest attorney.  For example, he has for years been banned from appearing

---

[17] Another indication of how closely Scarpa worked with Gallman is Gallman's association even
with Scarpa's son.  See, e.g., Call # 52 submitted during pre-trial litigation (Scarpa's son discussing with
Gallman what trials "we" are doing, referring to Scarpa, and laughing with Gallman that Gallman's
incarceration period was understated during the Ross trial).  Scarpa and his son shared their legal fees
with Gallman for his referrals, GX 55T, 2:46-3:25 (Gallman asking Scarpa's son if a client he "gave" him
had paid in full, implying that they needed to settle up later), which as the government explained in
Brettschneider's submission is unethical, see Rule 7.2 of N.Y. Rules of Professional Conduct (generally
forbidding payment to a person who recommended a client); id. Rule 5.4 (generally forbidding sharing of
legal fees with a nonlawyer).  In addition, during the Ross trial, Scarpa's son purported to be independent
counsel representing one of Scarpa's witnesses in Ross, Crystal Cincotta, but was with Scarpa during
some critical calls regarding the Cherry bribery scheme.  For example, he was there as Scarpa screamed
to Gallman about "letting my balls hang out in the wind," updated Gallman on Cherry's cross-
examination, see GX 28T, 2:41-3:3, and relayed Gallman's message that Gallman was on his way for his
special visit to Cherry, see GX 8T (Gallman leaving message); GX 9T (Scarpa calling Gallman back).

before Queens County Supreme Court Justice Kenneth Holder.[18]  The ban stemmed from Scarpa's lie to another Queens County judge.  To generate a scheduling conflict, Scarpa told that judge he already had a trial scheduled in front of Justice Holder on the day that the other judge wanted to schedule his own trial.  Scarpa then asked Justice Holder to "cover" for him if the other judge inquired about the schedule.  Unbeknownst to Scarpa, the judge to whom Scarpa lied had already asked Justice Holder to confirm Scarpa's trial date.  When Scarpa came to Justice Holder to propose that Justice Holder "cover" for him, Justice Holder told Scarpa that this lie was the last straw; Scarpa had for too long lied on and off and the record to Justice Holder.  As a result, Justice Holder ordered that all of Scarpa's then-pending matters—consisting entirely of homicide cases—be reassigned to other judges, and the judge banned Scarpa from ever appearing before him.  Justice Holder considers Scarpa's actions to be "reprehensible" and believes he has has "zero credibility."

> The Court should not be swayed by Scarpa's purported commitment to public service, despite his repeated references to his time as an ADA.  See Def. Ltr. 1, 2.  Scarpa submitted a letter from his wife, which purports to detail his career as a prosecutor, see Def. Ltr. Ex. A, at 2-3, but even that letter is misleading and, at times, outright false.  It portrays Scarpa as a star in the Queens County District Attorney's Office, who worked in the homicide bureau, was promoted to position of bureau chief in the environmental crimes division, and then poached by the Suffolk County District Attorney's Office, before leaving that office because of his apparent distaste for "corruption and unethical practices."  Id. at 3.  Scarpa was never a supervisor in the Queens office, let alone chief of a division, and in Suffolk County, he managed to hold the job

---

[18] This ban is well-known in the Queens County District Attorney's Office and in the Queens County Supreme Court, as it affected case-assignments on Scarpa's cases.  The government's account of the events that led to the ban is based on a phone interview it conducted with Justice Holder.

for 11 months.  The truth is that Scarpa bounced around three different offices, keeping the job in

Nassau County—a stint the letter he submitted from his wife conveniently omits—for only five

months.  Scarpa's titles and early career may not be significant in fashioning a sentence for

conduct he committed decades later, but his submission of lies to the Court is telling.

       C.    <u>The Need for Deterrence and to Promote Respect for the Law</u>

There are not many cases that demand the need for general deterrence and the

need to promote respect for the law as much as this one.  When sentencing Brettschneider, this

Court noted that "lawyers know and come to learn sentences imposed upon other attorneys and

significant sentences would certainly give pause to others about engaging in criminal conduct."

Brettschneider Tr. 28:13-16.  Lawyers must know that they are officers of the court, and while

they should zealously represent their clients, they cannot break the law.  Lawyers should not

have to compete for clients against peers who are willing to engage in unethical conduct or even

commit crimes.  Many defendants—particularly those like Ross, who face serious charges and

strong proof—may seek lawyers who are willing to tamper with witnesses.  In fact, after the

bribery scheme was partly exposed in the <u>Ross</u> trial, Ross's "friend," facing his own murder

charges, was interested in retaining Scarpa.  <u>See</u> GX 30T, 2:44-3:17.  A significant sentence in a

case that, as Scarpa acknowledges, has received significant attention, Def. Ltr. 7, n.5, would

discourage a race to the bottom among attorneys who are skirting the ethical boundaries of their

profession.

Moreover, bribery crimes like this one, which threaten the integrity of the

criminal justice system, are notoriously difficult to detect and prosecute.  The government was

fortunate in this case that a wiretap had been authorized on Gallman's phone just as Gallman and

Scarpa were engaged in the <u>Ross</u> trial.  The limited opportunities to deter a crime should also

33

factor in the Court's sentence.  As Judge Mauskopf stated when sentencing attorney Jonathan

Flom to 48 months for money laundering:

> [L]awyers need to be deterred when they abuse their license, their
> skill, their position of trust, to help fraudsters carry out their fraud.  I
> agree with the government when the government says fraud is hard
> enough to detect, it's even harder when a lawyer is willing to abuse
> his position of trust to shield that fraud from detection[.]

Sentencing Ex. D, July 28, 2017 Transcript of Sentencing of Jonathan Flom, 55:3-9.

        D.        The Need to Avoid Unwarranted Sentencing Disparities

           1.      Comparison with Gallman

      If the Court compares Scarpa's conduct to that of Gallman's, then Scarpa should

get a sentence that is higher than the 30 months Gallman received for the bribery count to which

he pled guilty.  See United States v. Johnson, 567 F.3d 40, 54 (2d Cir. 2009) ("[A] a district

court may -- but is not required to -- consider sentencing disparity among co-defendants under 18

U.S.C § 3553(a)(6).").[19]  To be sure, some factors support a more significant sentence for

Gallman: Scarpa does not have Gallman's criminal history; he was not convicted of the RDAP

fraud (for which Gallman received a consecutive six-month sentence, for a total 36-month

sentence); and he does not have a pending parallel state bribery case.

          But every other factor—putting aside the much higher Guidelines range for

Scarpa—cuts in favor of a more significant sentence for Scarpa.  *First*, Gallman pled guilty soon

after the superseding indictment charged him with the bribery offense.  He allocuted fully, before

Judge Reyes and this Court, about his and Scarpa's role in bribing Ross.  See Docket Nos. 74,

103.  Scarpa, however, has never accepted responsibility, and has gone beyond defending

---

[19] The government sought a 60-month total sentence for Gallman, for both the RDAP fraud and
the bribery conviction.  As set forth above, the government likely underestimated Gallman's Guidelines
for the bribery offense.

himself, by attacking the prosecution of the serious bribery offense as "misguided,"

"unfounded," and "overreaching."  Dkt. No. 129-2, at 1-2.

Even his sentencing submission, while claiming to respect the jury's verdict, Def. Ltr. 1, 3, shows that Scarpa thinks he has not done anything seriously wrong—just a slight lapse in judgment that in his view warrants a term of probation, Def. Ltr. 8.  Scarpa says he "had a duty to represent his client," Def. Ltr. 4, and, while he regrets the "associations and choices he has made," id. at 1, 4, he committed the offense in the spirit of "presenting a zealous defense," id. at 5.  Scarpa adds that Cherry would have testified for Ross anyway, Def. Ltr. 5, and Scarpa did not "seriously expect[]" that bribing Cherry to commit perjury would "exonerate his client." Def. Ltr. 7.  While he allows that the crime of conviction is "serious," he also finds no "tangible victim."  Id.  These statements show a complete refusal to acknowledge the gravity of the offense or his role in committing it.

Second, as recounted above, Scarpa again flouted the rule of law and violated the terms of his pretrial release by committing a state crime just two weeks after his arraignment. Never making much of that conduct, Scarpa now forgets even Judge Tiscione's ruling.  Def. Ltr. 2 (stating that he has complied with the terms of his pretrial release).  Gallman, by contrast, did not have any reported violations while he was on pretrial release on his parallel state case or any disciplinary history while incarcerated in pretrial detention on federal charges.

Third, Gallman's drug addictions and terrible childhood at least offered some mitigating circumstances for his crimes; Scarpa has none.  See Dkt. No. 143 (Gallman's sentencing submission).  Gallman was, at bottom, a life-long criminal striving to make money the only way he knew how—by committing crimes.  Scarpa is an educated, wealthy professional. By all accounts he was a skilled trial lawyer, who did not need to cross the lines as often as he

did into unethical behavior—much less criminal conduct—to zealously represent clients or to earn a living.

*Fourth,* as also mentioned above, Scarpa's conduct is made all the more egregious by his occupation as a criminal defense attorney and a former prosecutor.  He knew, at every step, that his actions were unethical and criminal.  The need for general deterrence and the opportunity to send a strong message with a significant sentence is therefore also greater.

*Fifth*, while Gallman convinced Cherry to testify falsely, it was from that point Scarpa's show.  He was the one who molded his entire trial strategy around Cherry's anticipated false testimony; he then met with Cherry twice, and scripted a direct-examination that would allow Cherry to explain away his prior statements and other incriminating evidence against Ross.  When the scheme was exposed, Scarpa was the one who tried to cover it up by claiming that he wanted Cherry exposed as a liar all along.  Scarpa was clearly the more culpable of the two.

Accordingly, the Guidelines range is not the only factor that counsels in favor of a sentence longer than Gallman's.

### 2.        Nationwide Comparison

According to the latest statistics provided by the United States Sentencing Commission,[20] the average sentence imposed for a bribery conviction is 22 months in prison.  Of course run-of-the-mill bribery does not involve the obstruction of justice in a double-homicide case.  Nor is the typical defendant an attorney, who violated the terms of his release two weeks after his arraignment and who has shown a disdain for the criminal justice system and the law that he has been sworn to uphold.

---

[20] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_2nd_FY19.pdf.

It is impractical to conduct a random sampling of similar offenses nationwide. But a survey of some published opinions and press releases—which admittedly skews the comparison towards more serious cases and significant sentences—shows that courts have not hesitated to impose severe sentences on attorneys despite the collateral consequence of disbarment, which Scarpa argues counsels in favor of leniency.  Def. Ltr. 3, 8.  Some of the cases summarized below are undoubtedly more serious than this one but the majority involve conduct that is less egregious, committed by both lawyers and non-lawyers.

| Case | Brief Description | Sentence Imposed |
|---|---|---|
| United States v. DeSalvo, 26 F.3d 1216, 1218-19 (2d Cir. 1994) | Attorney gave false testimony under oath about his colleagues' routine witness-bribing and evidence-manufacturing, though he himself was not charged with those crimes. | 30 months (by Judge Sifton) |
| United States v. Simels, 654 F.3d 161, 172-73 (2d Cir. 2011) | Attorney convicted for conspiring to obstruct justice, obstructing justice, and bribery,[21] stemming from the attorney's proposed bribing and threatening of potential witnesses against his client, and suggesting that the witnesses be eliminated. | 168 months (by Judge Gleeson) and $25,000 fine. |
| United States v. Jonathan Flom, 14-CR-507 (RRM) (E.D.N.Y.), aff'd United States v. Flom, 763 F. App'x 27 (2d Cir. 2019). | Attorney convicted of money laundering; Judge Mauskopf observing, "no question that the defendant's actual profit . . . [was] small." | 48 months (by Judge Mauskopf) |
| United States v. John Servider, 15-CR-174 (ENV) (E.D.N.Y.) | Attorney working at behest of co-defendant (his client) to help alter documents responsive to grand jury subpoena; Judge Vitaliano recognizing that co-defendant, not attorney, was the "major play[er] here."  Judge Vitaliano remarking that the attorney appeared to be an outstanding person, whose life could be "placed on a postage stamp . . . as | 18 months (by Judge Vitaliano) |

---

[21] The attorney's conviction for importing and possessing certain electronic devices was vacated on appeal.

| | | |
|---|---|---|
| | a father . . . , coach, Boy Scout leader, lawyer, community participant, benefactor, concerned for people beyond his own family . . . . the kind of guy you want on your block, the kind of guy you want in your family." | |
| United States v. Cassandra Cean, 11-CR-449 (SJ) (E.D.N.Y.), aff'd 621 F. App'x 44 (2d Cir. 2015); see also United States v. Cean, 771 F. App'x 81, 84 (2d Cir. 2019) (affirming restitution amount) | Attorney was convicted for her role in a mortgage fraud scheme by assisting unqualified straw buyers with good credit scores to obtain loans to purchase homes. A co-conspirator (who received an aggravated role enhancement) recruited straw buyers, another co-conspirator would complete the loan applications using false information, and the defendant-attorney would act as the closing agent. The attorney would then distribute money among the co-conspirators. At sentencing her counsel submitted, among other mitigating factors, the defendant's pregnancy. | 87 months (by Judge Johnson) and $243,148 in restitution |
| United States v. Everette Scott, 11-CR-975 (DAB (S.D.N.Y.) (Dkt. No. 81 for summary) | The defendant, an attorney, was convicted in two fraudulent schemes to benefit his client. He induced victims to transfer money into trust accounts, promising it would be held in escrow, but then distributed it to himself and his client. The government noted that the attorney's role was "less significant" than his client's, and that he "acted primarily at the direction [of the client] through the schemes." Dkt. No. 81, at 4. | 30 months and $1,005,000 in restitution |
| United States v. Frederic Cilins, 13-CR315 (WHP) (S.D.N.Y.). | The defendant (not an attorney), a French citizen, attempted (unsuccessfully) to persuade a cooperating witness to destroy contracts that connected him to bribe payments being investigated as violations of the FCPA. The defendant offered the witness money in return for destruction of | 24 months |

| | documents and signing a false statement.  The defendant also told the witness she should to lie to the FBI. | |
|---|---|---|
| United States v. Rosenthal, 805 F.3d 523, 526 (5th Cir. 2015). | Over the course of about four years, a personal injury attorney bribed a state judge to get favorable rulings, orders, and other treatment; conspired to pay witnesses to get false statements and testimony; fabricated evidence; fixed the random-case assignment system; and committed other acts of fraud. | 240 months |
| United States v. Carrick Mango, 14-CR-73 (ADA) (W.D. Tx.) (Dkt. No. 25 for summary). | The defendant (not an attorney) approached a witness in a federal trial, instructed him not to testify and gave the witness a menacing look.  On another occasion the defendant made statements to the trial AUSA and was ejected from the courtroom. | 120 months and $1,000 fine |
| United States v. Harris, 886 F.3d 1120 (11th Cir. 2018). | The defendant (not an attorney) was convicted of witness tampering and obstruction of justice for threatening a witness and her children for testifying against her family, making threatening statements on social media, making false statements to law enforcement, and attempting to help get false alibi testimony. | 120 months |
| United States v. Charity Engholm, 17-CR-40065 (SLD) (C.D. Ill.) (Dkt. No. 24 for summary). | The defendant (not an attorney), convicted for attempted witness tampering and conspiring to tamper with a witness.  Following the directions of her boyfriend (who had committed a robbery), she sent a Facebook message to a victim to ask to speak to her by phone.  She then offered money to the victim to recant her identification.  She proffered with authorities but while on bond in a state proceeding, she absconded. | 42 months |
| United States v. Joel Gilbert, 17-CR-419 (AKK) (N.D. Al.) (Dkt. No. 296 for summary). | An attorney (along with a co-defendant) was convicted for bribery, wire fraud and money laundering for bribing a state legislator with $375,000 to oppose | 60 months, $25,000 fine, and 100 hours of community service. |

| | certain actions by the Environmental Protection Agency. | |
|---|---|---|
| United States v. David Hudgens, No. 18-CR-82 (KD) (S.D. Al.) (Dkt. No. 19 for summary)[22] | The defendant, an attorney, pled to an information pursuant to which the government agreed to ask for low end of the Guidelines.  He was convicted of wire fraud for misappropriating funds that he was supposed to hold in IOLTA for a client.  He was disbarred before sentencing. | 33 months and $624,686 restitution |
| United States v. Delmar Hardy, 16-CR-0006 (MMD) (D. Nev.) (Dkt. No. 234 for summary) | The defendant, an attorney, was convicted of filing false returns for not reporting more than $400,000 in cash income from his law practice and making false deductions. | 25 months and fine of $10,000 |
| United States v. James Seltzer, 15-CR-327 (LHK) (N.D. Cal.) (Dkt. No. 38 for summary) | The defendant, an attorney, was convicted of securities fraud.  He convinced a victim to provide $350,000 to have a preferred-status account in a bank.  In reality, he deposited the money into his own account. Relevant conduct included a dozen other similar schemes. | 72 months and $4.65 million in restitution |
| United States v. James Schneider, 17-CR-20717 (FAM) (S.D.Fl.) (Dkt. No. 159 for summary) | The 77-year old attorney was convicted of securities fraud, wire fraud and money laundering.  Among other things, he created false documents for bogus companies and authored false legal opinion letters stating that the companies were not affiliates even though the shares were controlled by co-conspirators. | 84 months and $19.7 million in restitution |
| United States v. Christopher Pitts, 16-CR-23 (LSC) (M.D. Ala.) (Dkt. Nos. 52, at 6-8; 107 for summary) | The attorney was convicted of wire fraud.  He acted as a closing attorney for sales owned by the Department of Housing and Urban Development in Alabama.  He was supposed to have remitted payments to the agency after sales, but failed to do so.  Instead, he commingled the funds among escrow accounts and | 37 months and $1,090,888 restitution |

[22] See also https://www.justice.gov/usao-sdal/pr/former-attorney-receives-thirty-three-months-embezzling-money-his-client.

| | disbursed money from those accounts instead of providing it to the agency. | |
|---|---|---|

Brettschneider is not on this chart because his conviction for trying to get Richard Marshall admitted into a drug program under false pretenses and his extraordinary mitigating circumstances are, despite Scarpa's suggestion, Def. Ltr. 4, nowhere near comparable to Scarpa's. The government recognized as much, in not asking for any particular term of incarceration, see Dkt. No. 240, and stating that Brettschneider's crime was "nothing like the bribery that Mr. Scarpa has been convicted of," Brettschneider Tr. 19:14-15. In any event, Brettschneider's Guidelines range of 0-to-6 months was a fraction of Scarpa's, and his term of confinement while on probation was not, contrary to Scarpa's statement, a "below-guideline sentence." Def. Ltr. 4.

3.    Need for Substantial Fine

The Court should also impose a significant fine as part of its sentence. Scarpa reported earning about $180,000 annually from his law practice, PSR ¶ 74, with his wife earning an additional $200 per week as a "part-time kennel worker," PSR ¶ 61. Yet until 2019, they owned four vehicles—selling a Mercedes and a Porsche because they "did not need to own four vehicles," PSR ¶ 78—and have total assets of over $1.7 million. PSR ¶ 78. Not surprisingly, Scarpa has not provided Probation Department a copy of his tax returns, PSR ¶ 76, as he ran at least partly a cash business. See, e.g., GX 2T, 2:27-28 (Scarpa's son instructing Gallman to drop off cash he collected from a client in Scarpa's office); GX 54T, 3:16-46 (Scarpa telling Gallman that a client was "going to bring in $1,500—that's what she owes us"); GX 10T, 3:8-22 (Gallman telling Scarpa that he gave him $500 he received from a client).

Scarpa positioned himself to benefit from his bribery scheme by burnishing his reputation, and he should therefore pay financially for his crime.  See, e.g., GX 30T, 2:44-3:17 (telling Gallman, in a call that followed the exposure of Scarpa's conduct, that Ross's friend called Scarpa to represent him in a murder case for $50,000).   The Court assessed a $2,000 fine against Brettschneider, who committed a less serious offense, had a fraction of Scarpa's assets, and was financially responsible for significant medical expenses.

VI.    CONCLUSION

For these reasons, the government recommends that the Court impose a term of incarceration of 48 months and a significant fine.

Dated:    Brooklyn, New York
          September 13, 2019

Respectfully submitted,

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/ Andrey Spektor
       Andrey Spektor
       Lindsay K. Gerdes
       Keith D. Edelman
       Assistant United States Attorneys
       (718) 254-7000

42